Theo GARB, et al., Plaintiffs,

v.

REPUBLIC OF POLAND and Ministry
of Treasury of Poland (Ministertwo
Skarbu Panstwa), Defendants.

No. 99 Civ. 3487(ERK).

United States District Court,
E.D. New York.

June 24, 2002.

Joseph P. Garland, Law Office of Joseph P. Garland, New York, NY; Stephen A. Whinston, Berger & Montague, P.C., Philadelphia, PA (Edward W. Millstein, Michael C. Dell'Angelo, Berger & Montague, P.C., Philadelphia, PA; Mel Urbach, Law Offices of Mel Urbach, Jersey City, NJ; Edward E. Klein, Jay Solomon, Solomon Jaskiel, Klein & Solomon, LLP, New York, NY; Marvin A. Miller, Miller Faucher & Cafferty LLP, Chicago, IL; J. Dennis Faucher, Miller Faucher & Cafferty, LLP, Philadelphia, PA; J. Daniel Azulay, Azulay & Azulay, P.C., Chicago, IL; Kenneth F. McCallion, Rajan Sharma, Goodkind Labaton Rudoff & Sucharow, New York, NY; Kenneth A. Elan, Law Office of Kenneth A. Elan, New York, NY, on the brief), for Plaintiffs.

Owen C. Pell (Karen M. Asner, Alycia Regan-Benenati, on the brief) White & Case LLP, New York, NY, for Defendants.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

The complaint in this case arises out of the near total annihilation of the Jews of Poland by the Nazis during World War II and the subsequent horrendous treatment of the small number who survived. Prior to the War, Poland had the largest Jewish population in all of Europe—more than three million Jews. The overwhelming majority of these Jews died during the War or were murdered by the Nazis and their Polish collaborators. A small number of Polish Jews fled to Palestine. The majority of those who were fortunate to escape the horrors of the Holocaust moved eastward and sought refuge in the Soviet Union. After the War, on July 6, 1945, the Soviet Union and Poland entered into a repatriation agreement whereby 230,000 of these Polish Jews returned to Poland.

Many of the surviving Jews were in "horrible condition[;] .... they [were] exhausted, starved and half-naked, or in rags ... [and] sick." (Stein Aff. ¶ 9.) They arrived to find Poland "in a state of chaos and ruin." (Id. ¶ 5.) Much of their "property had been adversely possessed for as long as five years by the time of liberation and repatriation." (Pls.' Mem. at 5.) Tensions over that property sparked a renewal of violence against the Jews. During the

first two years after the war, more than 1,000 Jews were murdered. (Stein Aff. ¶ 10.)

Post–War violence against the Jews culminated in a riot which occurred on July 4, 1946 in Kielce, Poland. (Am.Compl.¶ 93.) A local boy's accusation of kidnaping by a mentally disabled Jew ignited simmering tensions between Jewish and non-Jewish residents of the town. (Stein Aff. ¶¶ 15–16.) A crowd gathered around a building that housed nearly 200 Jews. According to plaintiffs' affidavit, Polish army officers disarmed the Jewish residents of the building and forced them into the hands of the mob, whereupon 41 Jews were killed. (Id. ¶ 17.) Some historians believe that the riot was planned and implemented by Polish security officials and communist party higher-ups. (Id. ¶¶ 22–34.) Although nine individuals alleged to have participated in the Kielce riot were tried and executed, the army officers and security officials allegedly responsible for the riot were arrested, but never tried. (Id. ¶¶ 20, 22.)

Violence against Jews did not end after Kielce. Thirty-three other Jews were murdered that month. (Am.Compl.¶ 93.) Jewish property was looted. (Id.) The result of this post-war violence was that the vast majority of the few remaining Jews in Poland chose to emigrate by 1946, leaving behind their property and possessions. (Id. ¶ 95.) Anti–Semitic violence continued in Poland even after this mass immediate post-war emigration. In 1956, there were more than 40 incidents where Jews were beaten or abused. (Stein Aff. ¶ 39.) Plaintiffs allege that the local authorities did not react appropriately to these incidents and cite statements concerning the anti-Semitism of Communist party officials. (Id.) Plaintiffs also allege that in 1967 some 9,000 Jews were purged from the Communist party, the Foreign Ministry, the armed forces and the defense establishment in response to concerns over the development of a "Fifth Column" anti-Communist movement. (Id. ¶ 47; Am. Compl. ¶ 96.)

It is undisputed that, after the post-Kielce emigration, Poland nationalized land in 1946–47. Defendants maintain, however, that these nationalization laws affected all Poles and did not target or discriminate against Polish Jews specifically. (Defs.' Reply Mem. at 2; see Korzycka–Iwanow Aff. ¶¶ 9–10 (outlining six nationalization statutes enacted by the then-governing communist regime as a "means of production and central planning and management of the national economy")). According to defendants, laws were enacted relating to the following categories of property: (1) "deserted properties;" (2) "post-German" properties; and (3) "abandoned properties." (Korzycka–Iwanow Aff. ¶¶ 4–5.) The laws provided that "deserted property"—real property that was confiscated by the Nazis or that was the subject of forced sales—was to be returned to its owners, or their legal successors, if a claim application was received by December 31, 1948. (Id. ¶ 5.) Conversely, property characterized as "abandoned"—once belonging to the Third Reich or German citizens—became the property of the Treasury. (Id.) Plaintiffs allege that the true owners of much of this "abandoned property" were Jews and that this category was established to legitimize the taking of that property by defendants. (Am. Compl.¶ 102.)

On July 16, 1960, an Agreement was signed by Poland whereby it agreed to pay $40 million over a period of twenty years in full settlement of claims by United States nationals arising from the nationalization of property, the appropriation or loss of the use of property by the Polish government, and debts owed by nationalized enterprises or upon property which

has been nationalized. *See generally Agreement with the Government of the Polish People's Republic Regarding the Claims of Nationals of the United States,* July 16, 1960, 11 U.S.T. & O.I.A., T.I.A.S. No. 4545 (1960) ("1960 Treaty"). Claims for war damage and property taken by governments other than Poland were not covered under the agreement. (*Id.*) The Agreement was also restricted to persons who were United States citizens on the date the property was taken by the Polish government. (*Id.*)

Plaintiffs allege that officials of the Polish army and security services incited, participated in, and purposely failed to prevent the Kielce riot and the subsequent anti-Jewish violence—actions "motivated not simply by abstract anti-Semitism, but by a specific desire to prevent Polish Jews from reclaiming their property" after World War II. (Pls.' Mem. at 7.) Plaintiffs also cite a book alleging that the American government had some "official and semi-official indications provided by the Warsaw government that it is encouraging the migration of the Jews of [a major] part of its Jewish population." (Stein Aff. ¶ 12, citing George Lenczowski, *The Middle East in World Affairs* 330 (1980)). According to plaintiffs, "[a]t all times relevant to the events described herein, ministers, officers, and directors of Poland and [the Ministry of the Treasury] knew, or were in the possession of such information that they should have known, that they were part of an unlawful scheme that (i) resulted in depriving the Jewish Holocaust victims and their heirs of their Properties, and (ii) provided Poland and [the Ministry] with enormous profits from the use and enjoyment of such Properties." (Am. Compl.¶ 108.)

Plaintiffs and class members are "Jewish persons and entities (and their heirs and successors) who owned real property and improvements thereon in Poland during the period September 1, 1939 to May 30, 1945." (Am.Compl.¶¶ 2, 68.) Plaintiffs allege five claims. First, plaintiffs contend that defendants violated customary international law by creating, participating in, and/or failing to prevent the permanent dispossession of Polish Jews' property in the aftermath of the Holocaust and that defendants then profited commercially from their management of the properties. (Am.Compl.¶¶ 111–15.) Second, plaintiffs also accuse defendants of wrongfully converting plaintiffs' and other class members' properties for their own use and benefit. (Am.Compl.¶¶ 116–18.) Third, plaintiffs seek an order declaring defendants to be constructive trustees of the property seized and requiring them to turn over the income and profits of that property to plaintiffs and other class members. (*Id.* ¶¶ 119–21.) Fourth, plaintiffs demand an accounting of the amount and disposition of the property seized and of the profits derived therefrom. (*Id.* ¶¶ 122–24.) Fifth, the sub-class of plaintiffs whose property is currently held by a defendant, or any other Polish governmental body, seeks restitution. (*Id.* ¶¶ 125–28.)

## DISCUSSION

### A. Introduction

■ The Republic of Poland and its Ministry of the Treasury move pursuant to Federal Rule of Civil Procedure 12(b) to dismiss this action on the ground, *inter alia,* of lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611 (2001), which "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The Act is composed of both jurisdictional provisions, 28 U.S.C. § 1330,

and immunity provisions, 28 U.S.C. §§ 1602–1611. Section 1330(a) grants the district courts "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." § 1330(a). Conversely, § 1604 entitles foreign states to immunity from the jurisdiction of federal and state courts "except as provided in sections 1605 to 1607 of this chapter" and "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act." § 1604.

■ "Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of the United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Once the plaintiff has produced evidence showing that one of the Act's specified exceptions applies, the burden shifts to the foreign state to establish that it is immune from the jurisdiction of the United States courts. *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir. 1993). In the instant case, plaintiffs rely on two of the exceptions to immunity specified in the FSIA: the commercial activity exception, § 1605(a)(2), and the takings exception, § 1605(a)(3).

The commercial activity exception, § 1605(a)(2), provides, in pertinent part, for the exercise of jurisdiction over a cause of action against a foreign state based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." § 1605(a)(2). The commercial activity exception codifies the law with respect to claims against a foreign state that was in effect since 1952. The premise underlying this exception has been articulated by the Supreme Court as follows:

> Participation by foreign sovereigns in the international commercial market has increased substantially in recent years. The potential injury to private businessmen—and ultimately to international trade itself—from a system in which some of the participants in the international market are not subject to the rule of law has therefore increased correspondingly. As noted above, courts of other countries have also recently adopted the restrictive theory of sovereign immunity. Of equal importance is the fact that subjecting foreign governments to the rule of law in their commercial dealings presents a smaller risk of affronting their sovereignty than would an attempt to pass on the legality of their governmental acts. In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, they exercise only those powers that can also be exercised by private citizens. Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on "national nerves."

*Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 703–04, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (internal citation and footnote omitted).

The takings exception, § 1605(a)(3), provides, in pertinent part, for the exercise of jurisdiction over causes of action if "rights in property taken in violation of international law are in issue" and "that property . . . is owned or operated by an agency or instrumentality of the foreign state and

that agency or instrumentality is engaged in a commercial activity in the United States." § 1605(a)(3). Prior to the enactment of the FSIA in 1976, foreign states enjoyed absolute immunity from suit in the United States for causes of action based on the taking of property. *See Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir.1964). Section 1605(a)(3) maintains the rule of absolute immunity for the foreign state itself (except where the expropriated property is present in the United States), but effects a change in the law by subjecting "an agency or instrumentality" of a foreign state (which includes an organ of the foreign state) to suit in the United States for causes of action that otherwise meet the statutory criteria. The takings exception requires not only that the property be owned or operated by an agency or instrumentality of the foreign state, but also that the agency or instrumentality be engaged in commercial activity in the United States. The takings exception thus attempts to strike a balance between two seemingly contradictory policies—maintaining immunity for foreign states which expropriate property in violation of international law, while denying immunity to certain constituent parts of the foreign states.

The foregoing discussion requires the consideration of a threshold question presented by this case, namely, the retroactivity of the exceptions to the FSIA upon which plaintiffs rely. The operative events leading to the expropriation of plaintiffs' property occurred prior to 1952, when the defendants enjoyed immunity from suit for their commercial activities and for the expropriation of property, the latter exception continuing until the enactment of the FSIA in 1976. Because the Court of Appeals for the Second Circuit has held that the exceptions to the FSIA that changed prior law cannot be applied retroactively,

*Carl Marks & Co. v. Union of Soviet Socialist Republics*, 841 F.2d 26, 27 (2d Cir.1988), it is necessary to discuss the law prior to the enactment of the FSIA and the law regarding the retroactivity of the exceptions upon which plaintiffs rely. I then discuss those exceptions in addressing plaintiffs' claims that the operative act of expropriation occurred in 1957 and that, consequently, the commercial activity exception provides a basis for their cause of action.

## B. The Law Prior to the FSIA

Prior to 1952, foreign states enjoyed virtually absolute immunity from the jurisdiction of United States courts. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The doctrine of absolute immunity originated in an era of personal sovereignty, when the assertion of jurisdiction by one sovereign over another was thought to constitute an affront to the latter's dignity and independence. As stated by Chief Justice Marshall:

> One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him.

*The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137, 3 L.Ed. 287 (1812). The issue in *The Schooner Exchange* was whether the district court had jurisdiction over an armed vessel in the service of Napoleon, the emperor of France, the vessel being physically present

within the territory of the United States. *Id.* at 116–17, 7 Cranch 116. The Attorney General argued in favor of immunity on the ground that "[t]he right to demand redress belongs to the executive department, which alone represents the sovereignty of the nation in its intercourse with other nations." *Id.* at 132, 7 Cranch 116. Chief Justice Marshall expressly declined to reach the Attorney General's argument, relying instead on the "implied license" theory of immunity set forth in the quotation above in concluding that the district court lacked jurisdiction over the vessel. *Id.* at 146–47, 7 Cranch 116.

The "implied license" theory of immunity subsequently came to be regarded as supporting the extension of immunity to foreign sovereigns even in connection with their commercial activities in the United States. *See Berizzi Bros. Co. v. The Pesaro,* 271 U.S. 562, 574, 46 S.Ct. 611, 70 L.Ed. 1088 (1926). *The Pesaro* was an in rem proceeding against a merchant vessel owned and operated by the Italian government "in the service and interest of the whole Italian nation." *Id.* at 570, 46 S.Ct. 611. In response to an inquiry from the district court, the State Department took the position that " 'government-owned merchant vessels ... should not be regarded as entitled to the immunities accorded public vessels of war.'" *The Pesaro,* 277 F. 473, 479 n. 3 (S.D.N.Y.1921) (quoting statement of Solicitor of the State Department), *vacated by consent of parties.* The Supreme Court failed even to acknowledge the State Department's position, however, basing its decision instead on the "implied license" theory of immunity developed by Chief Justice Marshall in *The Schooner Exchange. The Pesaro,* 271 U.S. at 571–73, 46 S.Ct. 611. The Court concluded that jurisdiction was lacking over a vessel "held and used by a government ... for the purpose of advancing the trade of its people or providing revenue for its treasury." *Id.* at 574, 46 S.Ct. 611.

After *The Pesaro,* and with the passing of the era of personal sovereignty, the Supreme Court began to view the doctrine of immunity as a matter of judicial deference to the executive branch of government. *See Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 357 (2d Cir. 1964). This shift in the basis of the doctrine first became apparent in *The Navemar,* 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667 (1938), an in rem proceeding against a merchant vessel owned by the Spanish government. *Id.* at 70, 58 S.Ct. 432. The issue in the case was whether the district court was bound to accept as conclusive the "suggestion" of the Spanish ambassador that the vessel was in the Spanish government's possession and control, and therefore entitled to immunity under *The Pesaro. Id.* Noting that the State Department had declined to recognize the Spanish government's claim of possession and control of the vessel, *id.* at 71, 58 S.Ct. 432, the Court stated in dictum that, "[i]f the claim is recognized and allowed by the Executive Branch of the government, it is then the duty of the courts to release the vessel upon the appropriate suggestion by the Attorney General of the United States." *Id.* at 74, 58 S.Ct. 432. Absent recognition of the claim by the State Department, the district court was not bound to accept as conclusive the Spanish ambassador's suggestion, and the issue of the Spanish government's possession and control of the vessel was an "appropriate subject[ ] for judicial inquiry upon proof of the matters alleged." *Id.* at 75, 58 S.Ct. 432.

Subsequent decisions in *Ex Parte Republic of Peru,* 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943), and *Republic of Mexico v. Hoffman,* 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945), firmly established

judicial deference to the executive branch as the basis for the doctrine of foreign sovereign immunity. In *Ex Parte Republic of Peru*, the State Department formally recognized the Peruvian government's claim that a merchant vessel owned by it was immune from jurisdiction. 318 U.S. at 581, 63 S.Ct. 793. The Supreme Court held:

> Upon recognition and allowance of the claim by the State Department and certification of its action presented to the court by the Attorney General, it is the court's duty to surrender the vessel and remit the libelant to the relief obtainable through diplomatic negotiations. [Citing *The Navemar* and *The Schooner Exchange*.] This practice is founded upon the policy, recognized both by the Department of State and the courts, that our national interest will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings.

*Id.* at 588–89, 63 S.Ct. 793. In *Hoffman*, by contrast, the State Department took no position with respect to the asserted immunity of a merchant vessel owned by the Mexican government but not in its possession or control. 324 U.S. at 31–32, 65 S.Ct. 530. The Court held that, even "[i]n the absence of recognition of the claimed immunity by the political branch of the government," the district court was bound to decide whether immunity existed "in conformity to the principles accepted by the department of the government charged with the conduct of our foreign relations." *Id.* at 34–35, 65 S.Ct. 530. Stated otherwise, "[i]t is . . . not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." *Id.* at 35, 65

S.Ct. 530. As the State Department had declined to recognize the immunity claim both in the case at bar and in *The Navemar*, which was factually similar, the Court concluded that the Mexican vessel was subject to the jurisdiction of the district court. *Id.* at 37–38, 65 S.Ct. 530.

Despite this shift in the basis of the doctrine of sovereign immunity, foreign states continued to enjoy virtually absolute immunity from suit in the United States prior to 1952, even in connection with their commercial activities. *See Verlinden,* 461 U.S. at 486, 103 S.Ct. 1962 ("Until 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns."). Indeed, where a foreign state was named as a defendant in an in personam action, it was invariably held to be immune from the jurisdiction of the district court, whether or not the State Department had made a suggestion of immunity. *See Puente v. Spanish Nat'l State,* 116 F.2d 43, 45 (2d Cir.1940) (Spanish government held immune upon suggestion of Spanish ambassador); *Sullivan v. State of Sao Paulo,* 122 F.2d 355, 358–59 (2d Cir.1941) (citing *Puente* and holding that constituent states of Brazil were immune upon suggestion of Brazilian ambassador); *Piascik v. British Ministry of War Transport,* 54 F.Supp. 487, 487–88 (S.D.N.Y.1943) (citing *Ex Parte Republic of Peru* and holding that British Ministry of War Transport was immune upon suggestion of Secretary of State).

In 1952, the State Department announced, in the so-called Tate Letter, its adoption of the "restrictive" theory of sovereign immunity. Letter of Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman, May 19, 1952, *reprinted in* 26 Dep't of State Bull. 984–85 (1952) and *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711–15, 96 S.Ct.

1854, 48 L.Ed.2d 301 (1976). Under this theory, "the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)." *Alfred Dunhill,* 425 U.S. at 711, 96 S.Ct. 1854 (quotation from text of Tate Letter). Legal Adviser Tate cited the following reasons for the State Department's adoption of the theory: (i) most civil law countries had already adopted it; (ii) the Government of the United States did not claim immunity when sued in foreign courts in contract or tort; and (iii) "the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts." *Id.* at 714, 96 S.Ct. 1854. Under *Ex Parte Republic of Peru* and *Hoffman,* the courts were bound to apply the restrictive theory of immunity adopted by the State Department in the Tate Letter. *Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 358–59 (2d Cir.1964).

The commercial activity of a foreign state fell into the category of "private" acts for which immunity was denied under the restrictive theory, while expropriation fell into the category of "public" acts for which immunity was recognized. *Victory Transp.,* 336 F.2d at 360. In *Victory Transport,* the Comisaria General, a branch of the Spanish Ministry of Commerce, argued, *inter alia,* that its purchase of wheat pursuant to the Surplus Agricultural Commodities Agreement to help feed the people of Spain constituted a public act for which it was entitled to immunity. *Id.* at 361. The Comisaria General had made a request to the State Department for a suggestion of immunity, to which the State Department had failed to reply. *Id.* at 358–59. The Second Circuit denied the

Comisaria General's immunity claim, observing that only certain categories of acts, including "legislative acts, such as nationalization," qualified as the "strictly political or public acts" for which immunity was always recognized under the restrictive theory, even if, in any particular instance, the State Department failed to make a suggestion of immunity to the court. *See also Am. Hawaiian Ventures, Inc. v. M.V.J. Latuharhary,* 257 F.Supp. 622, 626–27 (D.N.J.1966) (Indonesian government immune from suit for alleged expropriation of plaintiff's property).

The immunity recognized by the courts prior to the enactment of the FSIA extended to the political subdivisions of a foreign state, including its departments and ministries, and, often, to other entities that performed governmental functions. *See, e.g., Oliver Am. Trading Co. v. Gov't of the United States of Mexico,* 5 F.2d 659, 661 (2d Cir.1924) (Mexican National Railways held immune). As explained by the Second Circuit in *Oliver:*

> While the action is nominally against both the government of Mexico and the National Railways in Mexico, it is in reality a suit only against the Mexican government. For it appears that the National Railways of Mexico is "merely a name" for a system of railroads in the possession of the Mexican government, and has been controlled and operated by Mexico since 1914 for national purposes, just as it operates the Post Office, the Customs Service, or any other branch of the national government.

*Id. See also, e.g., United States v. Deutsches Kalisyndikat Gesellschaft,* 31 F.2d 199, 202–03 (S.D.N.Y.1929) (distinguishing between "departments of government," entitled to immunity, and state-owned corporations, not entitled to immunity); *Sullivan v. State of Sao Paulo,* 122 F.2d 355, 359–60 (2d Cir.1941) (constituent states of Brazil

entitled to immunity as political subdivisions of foreign state); *Piascik v. British Ministry of War Transport,* 54 F.Supp. 487, 487–88 (S.D.N.Y.1943) (British Ministry of War Transport entitled to immunity as "duly constituted department of the British Government"); *In re Investigation of World Arrangements with Relation to Prod., Transp., Ref. & Distrib. of Petroleum,* 13 F.R.D. 280, 290–91 (D.D.C.1952) (Anglo–Iranian Oil Company entitled to immunity on ground that it performed "fundamental government function serving a public purpose"); *Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 356–57 (2d Cir. 1964) (branch of Spanish Ministry of Commerce assumed without discussion to be foreign state for immunity purposes).

## C. The FSIA and Its Retroactive Effect

In 1976, Congress enacted the FSIA in order to clarify the standards governing foreign sovereign immunity in United States courts and to free the executive branch from the case-by-case diplomatic pressures exerted upon it by foreign states. H.R.Rep. No. 94–1487, at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605–06; *see also Verlinden,* 461 U.S. at 488, 103 S.Ct. 1962. "For the most part, the Act codifies, as a matter of federal law, the restrictive theory of sovereign immunity." *Verlinden,* 461 U.S. at 488, 103 S.Ct. 1962. Section 1605(a)(2), for example, denies immunity to foreign states in actions based upon their commercial activities carried on in the United States or causing a direct effect in the United States. Section 1605(a)(3) is also consistent with pre-FSIA law to the extent that it maintains the immunity of foreign states in actions based upon the taking of property (except where the property is located in the United States). In other respects, however, the enactment of the FSIA effected a change in the law of foreign sovereign immunity.

Of particular significance in the context of the present discussion, § 1605(a)(3) subjects any "agency or instrumentality" of a foreign state to suit in the United States where "rights in property taken in violation of international law are at issue," provided that the agency or instrumentality owns or operates the property and is engaged in commercial activity in this country. The definition of "agency or instrumentality" under the FSIA could under some circumstances encompass certain departments or ministries of a foreign state. *See* H.R. No. 94–1487, at 15–16, *reprinted in* 1976 U.S.C.C.A.N., at 6614 ("As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including ... a department or ministry which acts and is suable in its own name."). The denial of immunity to the Ministry of the Treasury of Poland under the circumstances here would clearly conflict with pre-FSIA law, which did not distinguish between a foreign state and its departments or ministries, and which recognized the absolute immunity of foreign states in all actions based on their public acts, including expropriation.

In *Carl Marks & Co. v. Union of Soviet Socialist Republics,* 841 F.2d 26 (2d Cir. 1988), the Second Circuit held that the FSIA could not be applied retroactively to a claim that arose in 1918. The plaintiffs in *Carl Marks* were holders of debt instruments issued by the Russian Imperial Government in 1916. *Id.* at 27. In 1918, after the fall of the Imperial Government, the Bolshevik regime repudiated all foreign loans, including the debt instruments held by plaintiffs. *Id.* The Second Circuit held that, while the issuance of public debt fell within the commercial activity exception of the FSIA, § 1605(a)(2), the district court lacked jurisdiction over the suit, because:

Such a retroactive application of the FSIA would affect adversely the USSR's settled expectation, rising to the level of an antecedent right, of immunity from suit in American courts. We believe, as did the district court, that only after 1952 was it reasonable for a foreign sovereign to anticipate being sued in the United States courts on commercial transactions.

*Carl Marks*, 841 F.2d at 27 (citations and internal quotation marks omitted). Because the plaintiffs' claim arose before the State Department's issuance of the Tate Letter in 1952, the Second Circuit observed that it "need not decide the effect of the FSIA on causes of action arising between 1952 and the enactment of the Act." *Id.; see also Jackson v. People's Republic of China*, 794 F.2d 1490, 1497–98 (11th Cir.1986) (holding that Chinese government was immune from suit for its default on bonds that matured in 1951, because "to give the [FSIA] retrospective application to pre–1952 events would interfere with antecedent rights of other sovereigns").

Plaintiffs here argue that the Second Circuit's decision in *Carl Marks* does not preclude retroactive application of the FSIA to their claims, because Poland could not have had a "settled expectation" of immunity for the discriminatory taking of Jewish property after World War II. (Pls.' Mem. at 15–20.) This argument is difficult to reconcile with the premise that a clear consensus did not exist with respect to the issue whether expropriation by a foreign sovereign of property belonging to its own citizens violates the law of nations—even where the expropriation was part of a scheme of religious persecution of Jews in Nazi Germany. *See Filartiga v. Pena-Irala*, 630 F.2d 876, 888 n. 23 (2d Cir.1980) (distinguishing such conduct, which formed the basis for the cause of action in *Dreyfus v. Von Finck*, 534 F.2d 24 (2d. Cir.1976),

from torture, which was at issue in *Filartiga* ). Nor can it be reconciled with the act of state doctrine, which holds that:

[T]he judicial branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). *Cf. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 706, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) ("We decline to extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely commercial operations.").

Indeed, the extent to which the act of state doctrine posed an obstacle to an action of the kind brought here is demonstrated by the sad case of a Jewish victim of Nazi persecution who was imprisoned in 1937 and compelled by force, threats of physical violence and duress to transfer his property, which was eventually converted by a Dutch corporation to its own use in 1939. *Bernstein v. N.V. Nederlandsche–Amerikaansche Stoomvaart–Maatschappij*, 173 F.2d 71, 72–73 (2d Cir.1949). After initially dismissing a civil suit due to the act of state doctrine, *id.* at 75–76, the Second Circuit reversed itself, deferring to a State Department recommendation for jurisdiction over "suits for [the return of] identifiable property involved in Nazi forced transfers." *Bernstein v. N.V. Nederlandsche–Amerikaansche Stoomvaart–Maatschappij*, 210 F.2d 375, 375–76 (2d Cir.1954). Only this "supervening expression of Executive Policy" permitted an ac-

tion to proceed against a private party. *Id.* at 376.

The doctrine of sovereign immunity differs from the act of state doctrine because it goes to the issue whether a foreign state can be forced to defend a cause of action in the United States, while the act of state doctrine supplies the rule of decision if jurisdiction is exercised over the claim. *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 705 n. 18, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Indeed, the House Judiciary Committee report describing the exception to the doctrine of sovereign immunity for cases involving the expropriation of property in violation of international law emphasizes that it "deals solely with issues of immunity, [and] it in no way affects existing law on the extent to which, if at all, the 'act of state' doctrine may be applicable." H.R. No. 94–1487, at 20, *reprinted in* 1976 U.S.C.C.A.N., at 6618. I merely cite this choice of law rule, which often overlaps the doctrine of sovereign immunity, *Alfred Dunhill,* 425 U.S. at 705 n. 18, 96 S.Ct. 1854, to show that, even without reference to the doctrine of sovereign immunity, there is reason to question the premise that Poland would have had any expectation of being held to account here for its conduct at the time it occurred.

▬ The real issue, however, is whether, prior to the adoption of the FSIA in 1976, Poland enjoyed immunity from suit in the United States for the discriminatory taking of Jewish property even if other legal principles did not stand in the way of the successful prosecution of such an action. The answer is that a foreign state did enjoy such immunity prior to the enactment of the FSIA. To the extent that the FSIA overruled prior law, the holding in *Carl Marks* makes clear that it cannot be applied retroactively. Also unsustainable is plaintiffs' argument that defendants' conduct has been, and is, ongoing. Plain-

tiffs cite *Asociacion De Reclamantes v. United Mexican States,* 561 F.Supp. 1190 (D.D.C.1983), *aff'd,* 735 F.2d 1517 (D.C.Cir.1984), and *Von Dardel v. Union of Soviet Socialist Republics,* 623 F.Supp. 246 (D.D.C.1985), *vacated on other grounds,* 736 F.Supp. 1 (D.D.C.1990), in support for this argument. In *Reclamantes,* however, the Mexican Government had consistently acknowledged its obligation to pay the plaintiffs' claims, even after the suit was brought, *Reclamantes,* 561 F.Supp. at 1195, while in *Von Dardel,* the Soviet Union's alleged detention of Raoul Wallenberg was considered an "ongoing tort" because there was some evidence that Wallenberg might still be alive, notwithstanding the Soviet Union's representation that he had died in 1947, *Von Dardel,* 623 F.Supp. at 249–50, 260. *See also Carl Marks & Co. v. Union of Soviet Socialist Republics,* 665 F.Supp. 323, 348–49 (S.D.N.Y.1987), *aff'd,* 841 F.2d 26 (2d Cir.1988). Here, because defendants have not acknowledged the validity of plaintiffs' claims, and because those claims are not based on the ongoing tortious detention of a person, neither *Reclamantes* nor *Von Dardel* is apposite.

Although plaintiffs do not expressly so argue, some courts have held that the Supreme Court's decision in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), establishes the full retroactivity of the FSIA and thus effectively overrules the Second Circuit's decision in *Carl Marks.* *See, e.g., Haven v. Rzeczpospolita Polska (Republic of Poland),* 68 F.Supp.2d 943, 946 (N.D.Ill.1999) (FSIA applicable to claims virtually identical to those asserted here); *Altmann v. Republic of Austria,* 142 F.Supp.2d 1187, 1201 (C.D.Cal.2001) (FSIA applicable to claim for taking of artwork by Nazis in 1938); *see also Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1170 (D.C.Cir.

1994) (suggesting, but not deciding, that "all questions of foreign sovereign immunity, including those that involve an act of a foreign government taken before 1976, are to be decided under the FSIA"). In *Landgraf*, the Supreme Court provided an analytical framework for determining the retroactivity of a statute. *See Landgraf*, 511 U.S. at 263–80, 114 S.Ct. 1483. The issue in the case was whether certain provisions of the Civil Rights Act of 1991—creating a right to recover compensatory and punitive damages for specified violations of Title VII and providing for trial by jury if such damages were claimed—applied to a case pending on appeal when the provisions were enacted. *Id.* at 247–49, 114 S.Ct. 1483. In deciding that issue, the Court outlined a two-step process for determining the retroactivity of a statute. *Id.* at 280, 114 S.Ct. 1483. First, it must be determined "whether Congress has expressly prescribed the statute's proper reach." *Id.* "If Congress has done so, of course, there is no need to resort to judicial default rules." *Id.* Second, if the statute contains no such express command, it must be determined "whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If the statute would have such an effect, the "traditional presumption against retroactivity teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*

The first step in the *Landgraf* analysis is easily resolved in this case. The text of the FSIA does not express a clear congressional intent that the statute be applied retroactively. *Carl Marks & Co. v. Union of Soviet Socialist Republics*, 665 F.Supp. 323, 336–37 (S.D.N.Y.1987), *aff'd*, 841 F.2d 26 (2d Cir.1988). The second step in the *Landgraf* analysis is to determine whether application of the FSIA to plaintiffs' claims would have "a genuinely 'retroactive' effect." *Landgraf*, 511 U.S. at 277, 114 S.Ct. 1483. Elaborating on this step in the analysis, the Court stated:

> We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. [ . . . ] Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." *Hallowell [v. Commons*, 239 U.S. 506, 508, 36 S.Ct. 202, 60 L.Ed. 409 (1916)]. Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties," *Republic Nat. Bank of Miami [v. United States*, 506 U.S. 80, 100, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992)] (Thomas, J., concurring).

*Landgraf*, 511 U.S. at 274, 114 S.Ct. 1483. *See, e.g., Andrus v. Charlestone Stone Prods. Co.*, 436 U.S. 604, 607 n. 6, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978) (statute eliminating amount-in-controversy requirement in federal question cases applied retroactively); *Bruner v. United States*, 343 U.S. 112, 116–17, 72 S.Ct. 581, 96 L.Ed. 786 (1952) (statute repealing district court's jurisdiction over wage actions brought by employees of United States applied retroactively); *The Assessors v. Osbornes*, 76 U.S. 567, 575, 9 Wall. 567, 19 L.Ed. 748 (1869) (statute repealing Circuit Court's jurisdiction over cases arising under internal revenue laws applied retroactively); *see also United States v. Alabama*, 362 U.S. 602, 604, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960) (statute conferring jurisdiction on district courts over actions against states applied retroactively to case in which

plaintiff sought only prospective injunctive relief).

Nothing in the Court's decision in *Landgraf* overruled the Second Circuit's ruling in *Carl Marks* that a foreign state's settled expectation of immunity from the jurisdiction of the United States courts "ris[es] to the level of an antecedent right," *Carl Marks*, 841 F.2d at 27 (internal quotation marks omitted). Indeed, as the quotation set forth in the preceding paragraph shows, the Court simply reaffirmed in *Landgraf* the principles of retroactivity that it had been applying since at least as early as its decision in *Hallowell v. Commons*, 239 U.S. 506, 36 S.Ct. 202, 60 L.Ed. 409 (1916). Moreover, the Court's conclusion in *Landgraf*—that the relevant provisions of the Civil Rights Act of 1991 did not apply retroactively, *Landgraf*, 511 U.S. at 293, 114 S.Ct. 1483—provides no support for the argument that the FSIA applies retroactively.

Particularly apposite here is *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). The issue in *Hughes* was the retroactivity of an amendment to the *qui tam* provision of the False Claims Act, 31 U.S.C. § 3730(b), which permits, in certain circumstances, a suit by a private party on behalf of the United States against anyone submitting a false claim to the Government. *Id.* at 941, 117 S.Ct. 1871. Prior to 1986, such a suit was barred if the Government already had possession of the information on which the suit was based. *Id.* A 1986 amendment to the False Claims Act partially removed that bar. *Id.* The plaintiff in *Hughes* brought suit under the False Claims Act based on conduct predating the effective date of the amendment and argued that the amendment, which he needed to maintain his suit, should apply to his claim. *Id.* at 946, 117 S.Ct. 1871. In support of his claim, the plaintiff contended that the amendment did not increase the defendant's liability for past conduct; it merely affected whether a private party could bring suit on behalf of the United States. *Id.* at 948, 117 S.Ct. 1871. More generally, the plaintiff argued that the 1986 amendment was merely jurisdictional and, therefore, an exception to the general *Landgraf* presumption against retroactivity. *Id.* at 950, 117 S.Ct. 1871. The Court rejected the plaintiff's argument, holding:

> The 1986 amendment ... does not merely allocate jurisdiction among forums. Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in "jurisdictional" terms, is as much subject to our presumption against retroactivity as any other.

*Id.* at 951, 117 S.Ct. 1871 (emphasis in original). To the extent that the FSIA *created* jurisdiction over certain types of suits against foreign sovereigns, it is similar to the *qui tam* provision of the False Claims Act.

The Court's decision in *Verlinden* also supports the Second Circuit's ruling in *Carl Marks* that the FSIA should not be applied retroactively to the extent that it adversely affects a foreign state's settled expectation of immunity from suit in the United States courts. The issue in *Verlinden* was whether Congress, in enacting the FSIA, had exceeded the scope of Article III by granting the district courts subject-matter jurisdiction over certain civil actions by foreign plaintiffs against foreign sovereigns where the rule of decision was provided by state law. *Verlinden*, 461 U.S. at 491, 103 S.Ct. 1962. The Court held that the enactment of the FSIA was a

proper exercise of Congress's power to regulate foreign commerce, observing that:

As the House Report [on the FSIA] clearly indicates, the primary purpose of the Act was to "se[t] forth comprehensive rules governing sovereign immunity," H.R.Rep. No. 94–1487, at p. 12; the jurisdictional provisions of the Act are simply one part of this comprehensive scheme. The Act thus does not merely concern access to the federal courts. Rather, it governs the type of actions for which foreign sovereigns may be held liable in a court in the United States, federal or state. The Act codifies the standards governing foreign sovereign immunity as an aspect of substantive federal law [citing *Ex Parte Republic of Peru* and *Hoffman*]; and applying those standards will generally require interpretation of numerous points of federal law.

*Id.* at 496–97, 103 S.Ct. 1962. The Court's opinion thus made clear that sovereign immunity is an issue of substantive, not merely jurisdictional, law.

The preceding analysis suggests that the takings exception of the FSIA should not apply retroactively insofar as it allows jurisdiction over a claim brought against a department or ministry of a foreign state, since immunity would have been recognized with regard to such a claim prior to the enactment of the FSIA. By contrast, the commercial activity exception of the FSIA should apply retroactively to claims arising since the State Department's adoption of the Tate Letter in 1952. Plaintiffs argue that their claims arose in 1957, when, under Polish law, the property that they had abandoned during the War escheated to the Polish state. (*See* Korzycka Aff. Ex. C (decree, dated March 8, 1946, at art. 37)). Under these circumstances, if plaintiffs could satisfy the conditions of the commercial activity exception of the FSIA,

the defendants would not enjoy sovereign immunity. I need not determine whether plaintiffs' claims arose in 1947, as defendants maintain, or in 1957, as plaintiffs maintain, because, as the following discussion will show, even if plaintiffs' claims arose in 1957, they do not fall within the commercial activity exception. Likewise, although I do not finally resolve the issue, plaintiffs would very likely fail to satisfy the conditions of the takings exception.

## D. The Exceptions to FSIA Immunity

### 1. The Commercial Activity Exception

The commercial activity exception provides that a foreign state is not immune from the jurisdiction of the United States courts if:

the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

■ Plaintiffs allege that defendants' actions fall within the third clause of this exception. Under that clause, defendants are not immune if the expropriation: (1) took place outside of United States territory; (2) occurred "in connection with" a commercial activity; and (3) caused "a direct effect" in the United States. *Id.* Since the expropriation of plaintiffs' land occurred in Poland, only the latter two requirements are in dispute.

■ The commercial activity exception of the FSIA is intended to cover a foreign state's activities as a private player

in the marketplace, not to expose a foreign state to liability for its sovereign activities. *See Hanil Bank v. Pt. Bank Negara Indonesia, (Persero)*, 148 F.3d 127, 131 (2d Cir.1998) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 360, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993)); *see also Alfred Dunhill*, 425 U.S. at 699, 96 S.Ct. 1854 ("[T]he policy supporting the restrictive view of immunity ... is to assure those engaging in commercial transactions with foreign sovereignties that their rights will be determined in the courts whenever possible."). Consequently, the Second Circuit requires "a 'substantive connection' or a 'causal link' between [the operative acts in the suit] and the commercial activity." *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 930–31 (2d Cir. 1998) (quoting *Hanil Bank*, 148 F.3d at 130); *see also Hanil Bank*, 148 F.3d at 130 (issuance of letter of credit, and subsequent failure to honor it, satisfied "in connection" requirement). Otherwise, the "in connection" language of § 1605(a)(2) could be read "to include tangential commercial activities to which the 'acts'. forming the basis of the claim have only an attenuated connection, [and] the 'commercial activity' exception would effectively be rewritten to authorize the exercise of jurisdiction over acts that are essentially sovereign in nature." *Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 330 (2d Cir.1993) (citing *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C.Cir.1990)).

■ Plaintiffs argue their property was taken outside the United States "in connection" with its subsequent ownership and commercial operation. There are undoubtedly commercial consequences to that expropriation. Plaintiffs have attached a brochure produced by the Ministry that offers for sale real estate in the Polish city of Bialystok—some of which it is alleged was formerly plaintiffs' property. (*See* Garland Decl. at Ex. C.) Plaintiffs also allege, without citing to any evidence, that defendants have used United States financial institutions to maintain the properties and the profits therefrom. (Am. Compl.¶¶ 11–14.) Defendants do not contest that advertising and banking are commercial activities. Instead, they maintain that these activities are too attenuated from the operative acts in this suit to satisfy the "in connection" requirement.

"[T]he phrase ['based upon' in § 1605(a)(2)] is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357, 113 S.Ct. 1471 (citations omitted). Plaintiffs' claims—alleging a violation of customary international law, conversion, constructive trust, and seeking equitable accounting as well as restitution—are "based upon" the manner in which the property was obtained, not its subsequent management. "Expropriation is a quintessentially sovereign act and is never viewed as having commercial character." *Pena–Perez v. Procuraduria General De Justicia of Nicaragua*, No. 96 Civ. 0168, 1997 WL 122823, at *2 (S.D.N.Y. Mar.17, 1997) (citing *Carey v. National Oil Corp.*, 453 F.Supp. 1097, 1102 (S.D.N.Y.1978), *aff'd*, 592 F.2d 673 (2d Cir. 1979)); *see Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 294 (S.D.N.Y.1987) ("The nationalization of a bank is a quintessentially sovereign activity and may not serve as the basis for a suit against the Bank."). On facts virtually identical to those alleged in this action, Judge Shadur ruled that "[i]t is obvious that governmental expropriation of private property under governmental authority— whether legitimate or illegitimate—is the classic [sovereign] activity.... Whatever else may be said of the Governmental De-

fendants' alleged conduct, it is not 'commercial activity.'" *Haven,* 68 F.Supp.2d at 954.

Plaintiffs cannot "escape the requirements of § 1605(a)(3) through artful recharacterization of their takings claim." *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1106 (9th Cir.1990) (ruling that a claim that was "in substance a taking of property, not a tortious injury to property[,]" must be pled under § 1605(a)(3)); *see de Sanchez v. Banco de Nicaragua,* 770 F.2d 1385, 1398 (5th Cir.1985) (noting that "Congress [could not have] intended plaintiffs to be able to rephrase their takings claims in terms of conversion and thereby bring the claims even where the takings are permitted by international law"); *Alberti v. Empresa Nicaraguense De La Carne,* 705 F.2d 250, 254 (7th Cir. 1983) (ruling that § 1605(a)(2) does not apply where there was "no controversy" concerning the commercial activities subsequent to the nationalization); *but see Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 710 (9th Cir.1992) (ruling that defendants' expropriation of plaintiffs' property was performed "in connection with" defendants' subsequent commercial management and operation of the property). On this point, *Siderman* is unsupported by the legislative history of the FSIA and principles of statutory construction. The House Report on the Act provides examples of activities which should be considered "commercial" for the purposes of § 1605(a)(2) and others which should be considered governmental. The former include commercial transactions undertaken to achieve a governmental end. *See* H.R.Rep. No. 94–1487, at 16, *reprinted in* 1976 U.S.C.C.A.N., at 6615 (citing contracts to buy military provisions or construct a governmental building). Conversely, governmental activities with potential commercial implications do not qualify as commercial activities under the FSIA. *See id.* (citing foreign state's participation in foreign assistance program administered by United States government). Also, as a matter of statutory construction, the commercial activity exception requires the basis for the suit to be commercial. Otherwise, the commercial activities exception would subsume the FSIA's expropriation exception in § 1605(a)(3); every expropriation of property has some commercial implications.

■ Even if the "in connection" requirement of the third clause of § 1605(a)(2) has been satisfied, plaintiffs have failed to allege a "direct effect" of the alleged expropriation in the United States. The "direct effect" test focuses on whether the effect of defendants' activity is "sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case[.]" *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 313 (2d Cir.1981). An effect is direct if "it follows 'as an immediate consequence of defendant's ... activity.'" *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (quoting *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 152 (2d Cir.1991)). In addition, the Second Circuit has held that the specific conduct causing the direct effect in the United States must be legally significant to the cause of action. *See Filetech,* 157 F.3d at 931 (citing *Hanil Bank,* 148 F.3d at 133, and *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 999 F.2d 33, 34–35 (2d Cir.1993)).

Plaintiffs cite two "direct effects" of defendants' actions—neither of which satisfies the requirements of the "direct effect" test. First, plaintiffs point to the adversely affected class members who reside in the United States as directly affected by defendants' actions. This effect, however,

is insufficient as a matter of well-settled law. "[T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the [commercial activity] exception ... If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states." *Antares Aircraft*, 999 F.2d at 36. Second, plaintiffs contend that defendants advertised the expropriated property for sale in the United States and that defendants have used financial institutions in the United States to maintain the property. Even assuming that these activities were an element of the "act" upon which plaintiffs' action is based, they are insufficient to satisfy the "legally significant acts" test. This is because the activities allegedly causing a "direct effect" in the United States—the advertising of the property in the United States and the use of United States financial institutions to maintain the property—have no legal significance to this action. Thus, plaintiffs cannot avail themselves of the commercial activity exception to the FSIA.

## 2. The "Takings in Violation of International Law" Exception

Because I have concluded that the takings exception of the FSIA does not apply to confer jurisdiction for a claim arising prior to its enactment, it is unnecessary for me to address the merits of plaintiffs' argument. Nevertheless, I discuss the takings exception in some detail in order to frame the issue should the Court of Appeals conclude that my retroactivity analysis is flawed. The takings exception provides that a foreign state shall not be immune from the jurisdiction of the United States courts if:

rights in property taken in violation of international law are in issue and [i] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [ii] that property or any property exchanged for ·such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

28 U.S.C. § 1605(a)(3).

Since the property at issue here is in Poland, only the second clause of this exception can apply. Under this clause, plaintiffs must show that: (i) the property was taken in violation of international law; (ii) that property, or any property exchanged for that property, is owned or operated by an "agency or instrumentality" of the foreign state; and (iii) that agency or instrumentality was engaged in a commercial activity in the United States. *Id.*

Citing to the fact that many of the plaintiffs appear to have been Polish citizens at the time of expropriation, defendants argue that, as a·matter of well-settled law, a foreign state's expropriation of the property of its own nationals is not a violation of the "law of nations." *See Dreyfus v. Von Finck*, 534 F.2d 24, 31 (2d. Cir.1976) (finding that "violations of international law do not occur when the aggrieved parties are nationals of the acting state"). Most courts that have considered such expropriation have ruled that it does not violate international law. *See, e.g., Siderman de Blake v. Republic of Argentina,* 965 ·F.2d 699, 711 (9th Cir.1992) (holding that takings exception did not apply· to claims of plaintiffs who were citizens of defendant country); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th

Cir.1990) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law."); de Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1395–98 (5th Cir.1985) (holding that breach by Nicaragua of its own citizen's contractual right was not violation of international law). Moreover, in a number of these cases, the alleged expropriation was motivated by religious discrimination. See Dreyfus, 534 F.2d at 31 (dismissing suit for lack of jurisdiction where Jewish plaintiff, a former German citizen, sought restitution for the wrongful confiscation of his property in Nazi Germany in 1938); Siderman, 965 F.2d at 711 (expropriation did not violate international law despite evidence indicating that it was motivated by religious discrimination).

While the Second Circuit has rejected the broad premise of Dreyfus that international law does not constrain the conduct of a foreign state with respect to its own citizens, Filartiga v. Pena–Irala, 630 F.2d 876, 884–85 (2d Cir.1980) (foreign state's torture of its own citizens violates international law), it has held that, in contrast to the right of a citizen to be free from torture, "no consensus existed" on the issue whether the right to be free from the discriminatory and uncompensated taking of property was one of the "fundamental rights" conferred by international law "upon all people vis-a-vis their own governments," id. at 884–85, 888 n. 23 (citing Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)). Sabbatino concluded that "[t]here are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens." Sabbatino, 376 U.S. at 428, 84 S.Ct. 923; see also Alfred Dunhill, 425 U.S. at 704, 96 S.Ct. 1854.

Moreover, even if the plaintiffs could overcome this hurdle, it is also arguable whether they could satisfy the other predicates for the takings exception. Unlike the first clause of § 1605(a)(3), which permits jurisdiction over takings claims against foreign states provided that the expropriated "property or property exchanged for such property is present in the United States" (emphasis added), the second clause of this exception, governing property located outside the United States, requires that the property in question be "owned or operated by an agency or instrumentality of the foreign state." If the property is owned and operated by the foreign state itself or one of its political subdivisions, then jurisdiction cannot lie under the second clause of § 1605(a)(3).

The FSIA does not define the term "foreign state," providing only that it "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). Subsection (b) of § 1603 in turn provides:

> An "agency or instrumentality of a foreign state" means any entity—
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). Obviously, as plaintiffs concede, the Republic of Poland is not an "agency or instrumentality" of a foreign state, but the parties differ as to the status of the Ministry of the Treasury. The issue is whether the Ministry is, on the one

hand, the foreign state itself or a subdivision of it, or, on the other hand, an "agency or instrumentality" of the Republic of Poland and therefore potentially subject to jurisdiction under the second clause of § 1605(a)(3).

The Ministry of the Treasury would appear to be an integral part of Poland's political structure, and its core function—to hold and administer the property of the Polish state—is indisputably governmental. (*See* Kostorkiewicz Aff. at ¶ 16 ("The Ministry is part of the central government of Poland and exists to act on behalf of the Republic of Poland. By statute, the Ministry manages property, including land, on behalf of the Polish state.")). Moreover, defendants have submitted the affidavit of the former Director of the Legal Office of the Polish Senate stating that the Ministry "does not hold property separately from the Polish State" and that the Ministry "represents the Polish State with respect to financial claims brought against the State." (Kostorkiewicz Aff. at ¶ 16.) Defendants have also attached statutes to the affidavit confirming that the Ministry holds property on behalf of the Polish state. Article 44(1) of the Polish Civil Code provides that "[o]wnership and other property rights which constitute State property belong to State Treasury or to state legal persons." (*Id.* at Ex. C.) Similarly, Article 3.2 of the Law of August 8, 1996 on the Exercise of State Treasury Powers vests the Treasury "with property rights to State-owned assets, unless separate regulations specify that other state legal entity is vested with such rights." (*Id.*) Defendants' affidavit and the statutes attached thereto, which may properly be considered pursuant to Federal Rule of Civil Procedure 44.1, establish that the Ministry of the Treasury is an integral part of the Republic of Poland. It is true, of course, that these statutes refer to the Ministry as a "state legal entity," and that

the Ministry is subject to the jurisdiction of the Polish courts, (*id.* at ¶ 4). Nevertheless, it is arguable whether these minimal independent characteristics alone suffice for this particular Ministry to be viewed as an entity separate from the Republic of Poland under the circumstances here.

The Court of Appeals for the D.C. Circuit has held that the legal status of a foreign governmental entity under the FSIA "depends on whether [it] is the type of entity 'that is an integral part of a foreign state's political structure, [or rather] an entity whose structure and function is predominantly commercial.'" *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 151 (D.C.Cir.1994) (quoting *Segni v. Commercial Office of Spain,* 650 F.Supp. 1040, 1041–42 (N.D.Ill.1986)). The issue in *Transaero* was whether the Bolivian Air Force qualified as an agency or instrumentality of Bolivia and could therefore be served with process under § 1608(b) of the FSIA. *Transaero,* 30 F.3d at 151. The Departments of State and Justice filed an amicus brief in the case arguing that the Court of Appeals should consider not just the form of the entity, but also its core function, and whether a judgment against the entity would be paid out of the treasury of the foreign state. Brief of Amicus Curiae United States at 9–16, *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148 (D.C.Cir.1994) (No. 92–7222). The D.C. Circuit adopted the Executive Branch's analysis, holding that "the armed forces [of a sovereign state] are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." *Id.* at 153. The D.C. Circuit reasoned that:

> Any government of reasonable complexity must act through men organized into

offices and departments. If a separate name and some power to conduct its own affairs suffices to make a foreign department an "agency" rather than a part of the foreign state itself, the structure of section 1608 will list too far to one side. We hold that the armed forces of a foreign sovereign are the "foreign state" . . . .

*Id.*

In *Haven v. Rzeczpospolita Polska (Republic of Poland),* 68 F.Supp.2d 943 (N.D.Ill.1999), a case involving the same claims as the one at bar, Judge Shadur appears to have followed the D.C. Circuit's approach in holding that the Ministry of the Treasury was "in tautological terms" the foreign state itself under the FSIA. *Id.* at 944; *see also Haven v. Rzeczpospolita Polska (Republic of Poland),* 68 F.Supp.2d 947, 957 (N.D.Ill.1999), *aff'd,* 215 F.3d 727 (7th Cir.2000) (discussing applicability of second clause of § 1605(a)(3) only with respect to insurance company defendants). *See also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 618 n. 5, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("The Ministry of Foreign Trade is no different than the Government of Cuba of which its minister is a member.") (quoting district court's decision in the course of reinstating it, *Banco Nacional De Cuba v. Chase Manhattan Bank,* 505 F.Supp. 412, 425 (S.D.N.Y. 1980)).

The D.C. Circuit's approach in *Transaero* is consistent with the common understanding of the structure of a government instrumentality. As the Supreme Court observed in *First National City Bank:*

A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

These distinctive features permit government instrumentalities to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies. These same features frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments.

*First Nat'l City Bank,* 462 U.S. at 624–25, 103 S.Ct. 2591 (footnotes omitted). The Tennessee Valley Authority was cited as "perhaps the best known of the American public corporations." *Id.* at 625 n. 15, 103 S.Ct. 2591.

The discussion in *First National City Bank* distinguishes between "government agencies" and "government instrumentalities." Nevertheless, the FSIA definition of the term "agency or instrumentality" suggests that Congress was using the two words interchangeably to encompass quasi-independent commercial instrumentalities of the kind described in that case. The denial of sovereign immunity to such entities "enables third parties to deal with the instrumentality by knowing that they may seek relief in court." *Id.* at 625, 103 S.Ct. 2591. While the

House Report envisioned that, "[a]s a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including ... a department or ministry which acts and is suable in its own name," *see* H.R. No. 94–1487, at 15–16, *reprinted in* 1976 U.S.C.C.A.N., at 6614, the Ministry of the Treasury of Poland can hardly be viewed as an entity separate from the Republic of Poland. More significantly, the same is true, even if the Ministry's status could arguably be dependent on the nature of the activities underlying the cause of action. The conduct that forms the basis of the cause of action here, holding title to the property expropriated by the Republic of Poland, makes it impossible to hold that the Ministry is separate from the Republic. *Cf. Banco Nacional de Cuba v. First Nat'l City Bank of New York*, 478 F.2d 191, 194 (2d Cir.1973) (facts of case showed that National Bank of Cuba's function in expropriation of property made it "a mere arm or division of the Cuban government"). A contrary holding would undermine the immunity that Congress conferred on the Republic. As the United States observed in its amicus brief in *Transaero*: "If the judgment would essentially be one against the state and an entity's assets are not separate from those of the state, then the entity is not a legal person separate from the state even if, in a formalistic sense, that entity can enter into contracts in its own name, and sue or be sued in its own name." Brief of Amicus Curiae United States at 17, *Transaero* (No. 92–7222). Indeed, this is the standard adopted by the Supreme Court in determining whether an agency or instrumentality of a state is entitled to the Eleventh Amendment immunity enjoyed by the state. *Hess v. Port–Auth. Trans–Hudson Corp.*, 513 U.S. 30, 50–51, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

This approach is also consistent with the language of the FSIA, which defines a foreign state as including its political subdivisions as well as its agencies and instrumentalities. 28 U.S.C. § 1603(a). While the Act treats agencies and instrumentalities differently from the foreign state itself for a variety of purposes, *see, e.g.*, 28 U.S.C. §§ 1606 (liability for punitive damages), 1608 (service of process), 1610 (attachment and execution), including takings claims of the kind present here, it makes no distinction between political subdivisions and the foreign state itself. A scholarly commentary on the FSIA observes that "[s]o long as an entity functions essentially in a political or governmental capacity while subordinated in some fashion to a foreign state itself, the entity is a political subdivision of a foreign state. Political subdivisions therefore include both units of local or regional government, *or units of the national government which do not represent the government as a whole.*" Joseph W. Dellapenna, *Suing Foreign Governments and Their Corporations* 19 (1988) (emphasis added). The Second Circuit has adopted this interpretation of the term "political subdivision," holding that an Italian public financial entity qualified as a political subdivision under the FSIA. *O'Connell Mach. Co. v. M.V. "Americana"*, 734 F.2d 115, 116–17 (2d Cir.1984) (quoting H.R. No. 94–1487, at 15, *reprinted in* 1976 U.S.C.C.A.N., at 6613 (stating that "[t]he term 'political subdivisions' includes all governmental units beneath the central government")).

Numerous other courts have assumed without discussion that governmental departments or ministries qualify as political subdivisions of a foreign state under the FSIA. *See, e.g., Magness v. Russian Fed'n*, 247 F.3d 609, 613 n. 7 (5th Cir.2001) (characterizing Russian Ministry of Culture as political subdivision of Russia for

purposes of service of process); *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1298 (11th Cir.2000) (characterizing Yemeni Ministry of Supply & Trade as political subdivision of Yemen for purposes of determining legal status of entity controlled by Ministry); *Kao Hwa Shipping Co. v. China Steel Corp.*, 816 F.Supp. 910, 914 (S.D.N.Y.1993) (characterizing Taiwanese Ministry of Economic Affairs as political subdivision of Taiwan for purposes of determining legal status of entity owned by Ministry); *see also Filus v. LOT Polish Airlines*, 819 F.Supp. 232, 236–37 (E.D.N.Y.1993) (Nickerson, J.) (characterizing Ministry of Civil Aviation of USSR alternately as foreign state itself and as political subdivision thereof for purposes of service of process).

In sum, it is arguable whether in the instant case the Ministry of the Treasury can be viewed as a legal entity separate from the Republic of Poland. On the contrary, it appears to be an integral part of the Republic of Poland or a political subdivision thereof; any money judgment here would be paid by the Republic of Poland, and any order directing the return of expropriated property would compel the Ministry of the Treasury to divest itself of property held on behalf of the Republic of Poland, assuming that the Ministry still holds title to it. Under these circumstances, permitting the cause of action here would appear to undermine the immunity Congress intended to confer on the Republic of Poland under the FSIA.

**E. The Waiver of Sovereign Immunity**

 Plaintiffs' final argument is that defendants impliedly waived their sovereign immunity by violating the *jus cogens* norms of international law in "unleash[ing] a wave of mob violence directed at Jews" and in subsequently expropriating their property. (*See* Defs.' Mem. at 22.) A *jus cogens* norm " 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.' " *Siderman*, 965 F.2d at 714 (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679). "While commentators may disagree on the exact scope of all *jus cogens* norms, there is universal consensus on the existence of norms against genocide and enslavement." *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1180 (D.C.Cir.1994) (Wald, J., dissenting).

The theory that a foreign state should be deemed to have forfeited its sovereign immunity whenever it engages in conduct that violates fundamental humanitarian standards was formulated after the enactment of the FSIA. *See Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242 (2d Cir.1996) (citing Adam C. Belsky, Mark Merva, Naomi Roht–Arriaza, Comment, *Implied Waiver under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law*, 77 Calif. L.Rev. 365 (1989)). Prior to the enactment of the FSIA, the courts found an implied waiver of foreign sovereign immunity only where a foreign state brought suit in the United States or took some other action related to the conduct of litigation that manifested an intention to waive immunity. *See, e.g., Nat'l City Bank of New York v. Republic of China*, 348 U.S. 356, 364, 75 S.Ct. 423, 99 L.Ed. 389 (1955) ("It is recognized that a counterclaim based on the subject matter of a sovereign's suit is allowed to cut into the doctrine of immunity."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 438, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("[F]airness has been thought to require that when the sovereign seeks recovery, it

be subject to legitimate counterclaims against it."). The House Report on the FSIA gave other examples of implied waiver under prior law:

> With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.

H.R. No. 94–1487, at 18, *reprinted in* 1976 U.S.C.C.A.N., at 6617.

Section 1605(a)(1) of the FSIA provides that a foreign state "shall not be immune from the jurisdiction of courts in the United States [if] the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). In *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir.1996), the Second Circuit squarely "reject[ed] . . . the claim that a *jus cogens* violation constitutes an implied waiver [of foreign sovereign immunity] within the meaning of the FSIA." *Id.* at 245. The Second Circuit began its discussion of the doctrine of implied waiver by observing that it had "no doubt" that Congress, in enacting the FSIA, "ha[d] the authority either to maintain sovereign immunity of foreign states as a defense to all violations of *jus cogens* . . . or to remove such immunity. . . ." *Id.* at 242. Based primarily on the examples of implied waiver given in the above quotation from the House Report, the Second Circuit concluded that "Congress had not intended to remove the defense" of sovereign immunity for violations of *jus cogens*. *Id.* at 244. The other courts of appeals that have addressed the issue have all reached the same conclusion. *See Samp-*

*son v. Federal Republic of Germany,* 250 F.3d 1145, 1156 (7th Cir.2001) ("Congress did not create an implied waiver exception to foreign sovereign immunity under the FSIA for *jus cogens* violations."); *Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1174 (D.C.Cir.1994) ("We have no warrant . . . for holding that the violation of *jus cogens* norms by the Third Reich constitutes an implied waiver of sovereign immunity under the FSIA."); *Siderman,* 965 F.2d at 719 ("The fact that there has been a violation of *jus cogens* does not confer jurisdiction under the FSIA."). Because plaintiffs' claim of implied waiver fails both under pre-FSIA law and under § 1605(a)(1) of the Act, I need not address the issue of the statute's retroactivity in this context.

## CONCLUSION

I have written before that "strong moral claims are [not] easily converted into successful legal causes of action." *In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d 139, 149 (E.D.N.Y.2000). I am compelled to dismiss the complaint *not* because of a determination that the conduct challenged here is lawful. The conduct alleged may very well violate the evolving standards of the law of nations. Indeed, a private individual holding title to expropriated property would not enjoy immunity from suit. Moreover, such an individual would arguably be precluded from invoking the act of state doctrine. *See Bigio v. Coca–Cola Co.,* 239 F.3d 440, 451–53 (2d Cir.2000). The complaint is dismissed solely because the Republic of Poland and its Ministry of the Treasury may not be required to defend the cause of action alleged in the complaint in the United States. The dismissal places on the Republic of Poland the obligation to resolve equitably the claims raised here. Because the dismissal is based on the jurisdictional defense asserted here, I do not

address the other grounds urged by defendants in support of their motion to dismiss.

SO ORDERED.