**COMPAGNIE NOGA D'IMPORTA-TION ET D'EXPORTATION S.A., Plaintiff–Appellant,**

v.

**THE RUSSIAN FEDERATION, Defendant–Appellee.**

**Docket Nos. 02–9237(L), 02–9272(CON).**

United States Court of Appeals, Second Circuit.

Argued: June 12, 2003.

Decided: March 16, 2004.

Herbert C. Ross, Jr., Olshan Grundman Frome Rosenzweig & Wolosky LLP, New York, NY, for Plaintiff–Appellant.

Howard S. Zelbo, Cleary, Gottlieb, Steen & Hamilton, New York, N.Y. (Boaz S. Morag and Inna Reznik, Cleary, Gottlieb, Steen & Hamilton, New York, NY, on the brief), for Defendant–Appellee.

Before: MINER, JACOBS and CABRANES, Circuit Judges.

Judge JACOBS concurs in a separate opinion.

MINER, Circuit Judge.

In these consolidated appeals, we are confronted with the issue of whether a foreign arbitration award can be confirmed and enforced against a sovereign nation where the arbitration agreement was signed by an organ of that nation's central government and where that organ—and not the nation itself—participated in the underlying arbitration proceedings. Specifically, plaintiff-appellant Compagnie Noga D'Importation et D'Exportation S.A. ("Noga") sought to confirm and enforce a Swedish arbitration award against defendant-appellee Russian Federation. The

Russian Federation opposed confirmation principally on the ground that it was a party to neither the arbitration agreement nor the Swedish arbitration proceedings. Instead, it argued that the proper party to these proceedings should be the Government of Russia (the "Government"), a political organ of the Russian central government. The United States District Court for the Southern District of New York (Pauley, *J.*), accepted the Russian Federation's argument and denied Noga's motion to confirm. For the reasons set forth below, we conclude that, for the purposes of these proceedings, the Russian Federation and the Government are the same party, and accordingly, we vacate the judgment of the District Court. Furthermore, we remand for further proceedings with respect to, among other things, (i) whether Noga's assignments of its arbitration proceeds to certain of its creditors deprived it of standing to seek confirmation of the arbitral award; and (ii) whether the creditors to whom Noga assigned the arbitration proceeds must be joined as necessary and indispensable parties under Fed.R.Civ.P. 19.

## BACKGROUND

I. *Loans That Were the Subject of the Underlying Arbitration*

In December 1990, Noga entered into supply contracts to provide $550 million worth of food and consumer goods to foreign trade agencies of both the Union of Soviet Socialist Republics ("USSR"), the predecessor to the Russian Federation, and the Federative Socialist Soviet Republic of Russia ("RSFSR"), a constituent republic of the USSR. When anticipated third-party financing for these supply contracts did not materialize, Noga agreed to finance them in part.

In April 1991, Noga entered into a $422.5 million loan agreement ("1991 Loan Agreement") with the Government of the RSFSR, which was represented by its Council of Ministers and defined in the agreement as the "Borrower." The stated purpose of the 1991 Loan Agreement was to finance Noga's existing supply contracts with the state-owned agencies and enterprises of the RSFSR. As consideration for the 1991 Loan Agreement, the Borrower agreed to cause the RSFSR-owned oil company to deliver crude oil products to Noga pursuant to a schedule extending into September 1993. Moreover, the Borrower represented that it had obtained all the "required licenses, approvals and consents from the appropriate Authorities of the U.S.S.R." to provide this consideration. As contemplated in the 1991 Loan Agreement, Noga and the RSFSR state oil company entered into a separate agreement for the delivery of crude oil products. In anticipation of receiving the crude oil products on schedule, Noga advanced cash and credit to finance RSFSR imports of food and consumer goods and the development of a baby food factory and a television station in the RSFSR.[1]

In January 1992, Noga and the Government of the Russian Federation [2] entered

---

1. In August 1991, the 1991 Loan Agreement was amended to increase the principal amount of the loan by $50 million for the television station. In November 1991, the Loan Agreement was amended to increase the principal amount of the loan by $500 million to finance the supply of foodstuffs.

2. The Soviet Union collapsed between the execution of the 1991 and 1992 Loan Agreements. By the time the 1992 Loan Agreement was executed, the Russian Federation had succeeded the RSFSR. Moreover, during the period 1992–1993, the Russian Federation assumed both the debts and the assets of the former Soviet Union and its constituent republics. *See* Paul Williams & Jennifer Harris, *State Succession to Debts and Assets: The Modern Law and Policy*, 42 Harv. Int'l L.J. 355, 366–83 (2001).

into a $400 million loan agreement ("1992 Loan Agreement"), which defined the term "Borrower" as "the Government of the Russian Federation, acting for and on its own behalf and responsibility [sic]." The 1992 Loan Agreement provided that half of the $400 million loan would be used to finance supply contracts executed between Noga and another agency of the Russian Federation for the import of agro-chemical products and that the other half would be used to discharge state debt to foreign suppliers for deliveries of similar products to the RSFSR during the period 1990–1991. The promised consideration for the 1992 Loan Agreement was the delivery of crude oil from an agency of the Russian Federation under a separate contract with that agency and pursuant to a delivery schedule extending through the end of 1994. In anticipation of these deliveries and pursuant to the 1992 Loan Agreement, Noga financed imports of agro-chemical products into the Russian Federation.[3]

Both the 1991 Loan Agreement and the 1992 Loan Agreement provided for: (i) binding arbitration of any disputes between the parties and their successors in the Chamber of Commerce of Stockholm, Sweden; (ii) the choice of Swiss law to resolve those disputes; (iii) the waiver of immunity with respect to the enforcement of any arbitration award; and (iv) consent to suit in the state and federal courts of, inter alia, New York.

## II. Swedish Arbitration Proceedings

Disputes eventually arose between Noga and the Government regarding performance of the Loan Agreements. In December 1992, Noga declared the Government to be in default, claiming that it owed Noga $300 million in principal and interest. In April 1993, Noga terminated the agreements and accelerated payment on the loans. In June 1993, Noga filed a Request for Arbitration with the Stockholm Chamber of Commerce, seeking over $275 million for unpaid balances, plus consequential damages. Noga's Arbitration Request identified the Russian Federation as the respondent and explained that its decision to do so was based on the facts that (i) "[b]oth the 'buying' and the 'selling' Agencies '[were]' the Russian Federation, i.e. under the [Russian Federation's] control"; (ii) "[a]ll contracts between [Noga] and the Agencies [made] express reference to the contracts entered into by Noga and the Russian Federation, since such contracts represent[ed] the performance of the Loan Agreements"; and (iii) "[t]he Russian Federation guaranteed performance by the 'selling' Agencies for repayment of the Loans."

The Russian Federation made no response to the Arbitration Request. Instead, attorneys representing the Government objected to Noga naming the Russian Federation as the respondent and requested that the arbitrators require Noga to amend its Arbitration Request to name the Government and the state agencies that had signed the contracts as the proper respondents. In response, Noga argued that the arbitrators should "overrule" the Government's objection on the ground that the Russian Federation and the Government were the same legal person and thus the Government's acts were directly attributable to the Russian Federation. The arbitrators never ruled on the Government's objection, and Noga never sought judicial intervention to compel the Russian Federation to participate in the arbitration.

Eight years of arbitration proceedings followed. The arbitration was conducted in two phases. Phase I related to liability

---

**3.** In February 1992, the 1992 Loan Agreement was amended to increase the principal amount of the loan to $440 million to pay for an insurance premium related to the loan.

and damages, except for consequential damages; Phase II related to consequential damages. Throughout the arbitration proceedings, the Government—and not the Russian Federation—appeared and arbitrated with Noga.

### A. *Phase I*

At the conclusion of Phase I, the arbitrators issued two awards, both of which are the subject of this appeal. In the first award, dated February 1, 1997, the tribunal determined that Noga had been justified in both declaring a default and in accelerating the remaining oil deliveries. The arbitrators awarded Noga approximately $23 million in damages, plus accrued interest from April 1993 until the date of payment. On May 15, 1997, the tribunal issued a supplemental award, which increased the amount of the earlier award by approximately $4 million for management fees that Noga had alleged were omitted from the first award. Together, the two awards (collectively, the "Phase I Award") totaled approximately $50 million, including interest through May 1997. The caption of the arbitration awards refers to the respondent as the "Government of the Russian Federation (Russia)" Throughout the awards, however, the arbitrators refer interchangeably to the "Government of the Russian Federation," the "Russian Federation," and "Russia."

The Government appealed the supplemental award to the District Court of Stockholm, which dismissed the appeal and awarded attorneys' fees and costs to Noga. The caption contained in the Swedish court's decision identified the "Russian Federation, the Ministry of Finance" as the plaintiff. The court's decision repeatedly refers to the plaintiff as the "Russian Federation," although the issue of which entity was the proper party was not before it, and it was not being asked to confirm the Phase I Award. The Stockholm District Court's decision was affirmed by the Svea Court of Appeal, which also referred to the "Russian Federation" in both the caption and text of its decision and awarded Noga additional attorneys' fees and costs.[4] Neither the Russian Federation nor the Government has paid the Phase I Award.

### B. *Phase II*

On March 13, 2001 (while the actions giving rise to this appeal were pending), the arbitrators issued an award finding that Noga was entitled to approximately $25.3 million in consequential damages, plus interest that had accrued during the eight years since the Arbitration Request had been filed. As of the date the briefs in this appeal were filed, an appeal of the Phase II Award was still pending in the Swedish courts, and Noga had not yet sought to confirm or enforce this award.

### III. *Noga's Financial Problems and Assignments of Its Arbitration Claims to Its Creditor Banks*

### A. *The Assignments*

In 1993 and 1994, Noga assigned portions of the expected proceeds from both the Phase I and Phase II arbitration awards to four Swiss banks (the "Assignee Banks"), which had financed Noga's performance of the 1991 and 1992 Loan Agreements. Three of these assignments (which were originally written in French and subsequently translated into English) stated that they served as guarantees of Noga's debts to the respective banks. The first assignment, to Banque Nationale de Paris (Suisse) S.A.—Basle, assigned 10

---

**4.** The attorneys' fees and costs awarded by these two courts (about $31,000) are referred to by the parties as the "Swedish Court Judgments."

million Swiss francs for every $100 million Noga received in the arbitration, not to exceed 20 million Swiss francs. The second assignment, to Credit Lyonnais (Suisse) S.A., assigned $5 million for the first $55 million received in the arbitration, and $1.814 million "for each collection exceeding" $55 million, with the caveat that, if the arbitration proceeds were less than $55 million, the payment would be "effected pro rata to the sum received." The third assignment, to United Overseas Bank, assigned the lesser of fifteen percent of the arbitration proceeds or $20 million. The fourth assignment, to Caisse d'Epargne de Geneve ("CEG"), assigned $10 million for every $50 million Noga received in the arbitration, not to exceed $20 million. CEG, in turn, "reassign[ed]" to Noga "in a fiduciary capacity and for collection purposes" CEG's portion of the arbitration proceeds.

### B. The Concordat

In June 1997, one month after the arbitrators issued the Phase I Award, Noga obtained from the Court of Justice of the Republic and State of Geneva a stay of any attempt to place Noga into bankruptcy, so that Noga could propose a composition plan (similar to an American Chapter 11 reorganization plan) to its creditors. The Swiss court subsequently approved Noga's plan, referred to as a "Concordat." Under the terms of the Concordat, Noga was permitted to discharge its debts incurred prior to June 1997 (other than debts owed to certain preferred creditors, including

the Assignee Banks) by paying a dividend equal to about twelve percent of the accepted value of its creditors'·claims.[5]

In the Concordat, the Assignee Banks agreed to receive their portions of Noga's collection of its arbitration claims subject to certain conditions. First, Noga would pursue, in its own name, both for itself and for the Assignee Banks, all steps ˙necessary to obtain: (i) payment of the Phase I Award; (ii) acknowledgment by the Russian Federation of the remaining balance owed to Noga; and (iii) payment of that balance through arbitral proceedings, judicial proceedings, enforcement proceedings, or amicable negotiations. Second, Noga agreed to keep the Assignee Banks informed regarding its attempts to obtain these payments and the results of those attempts, and to consider the Assignee Banks' advice, recommendations, and suggestions. Finally, the Assignee Banks reserved the right to enforce directly against the Russian Federation their assigned portions of Noga's claim, following notice to Noga. To date, none of the Assignee Banks has exercised this right.

The Concordat also established the following priority for application of any payment of Noga's arbitration claims: (i) full payment of the arbitration costs and/or collection of those costs (as defined in a Swiss court judgment); (ii) payments to the Assignee Banks according to the terms of their assignment agreements; (iii) a refund to one Jean Rouch of funds advanced

---

**5.** These discounted claims included claims owed to certain Russian entities with respect to transactions relating to the 1991 and 1992 Loan Agreements. According to the Russian Federation, the value of these claims was roughly equal to the amount owed˙ to Noga under the Phase I Award, and the Government intended to acquire these claims and set them off against the amounts due under that award. As a result of the Swiss Concordat, however, these claims were never acquired

and the set offs never applied. The Russian Federation participated in the Swiss Concordat proceedings through its Ministry of Finance and other state agencies, and successfully claimed in the District Court that the Swedish Court Judgments were subject to set-off, pursuant to an agreement executed in those Swiss proceedings. As discussed below, the District Court accepted this argument, and Noga has not sought review of that decision on appeal.

to Noga for payment of its expenses during the moratorium and his payments to creditors in the first and second classes, if any, and to creditors in the third class;[6] and (iv) the balance to Noga.

## IV. *Proceedings in the District Court*

On January 27, 2000, Noga filed an action against the Russian Federation in the United States District Court for the Western District of Kentucky (the "Kentucky Action"), seeking confirmation and enforcement of the Phase I Award and domestication of the Swedish Court Judgments under Kentucky law.[7] The next day, a similar action (the "New York Action") was filed in the United States District Court for the Southern District of New York (the "District Court"). In June 2000, the Russian Federation moved to dismiss the New York Action on the ground of improper service. In September 2000, the Kentucky Action was transferred to the District Court, where it was subsequently consolidated with the New York Action. During the last week of September 2000, the Russian Federation withdrew its motion to dismiss for improper service, and Noga filed a consolidated complaint in the District Court for the two actions, seeking confirmation and enforcement of the Phase I Award and recognition and enforcement of the Swedish Court Judgments.

In October 2000, the Russian Federation filed its answer, asserting four affirmative defenses: (i) that the complaint failed to state a cause of action; (ii) that the Russian Federation was not a proper party to the action because it was not a party to the Swedish arbitration; (iii) that Noga lacked standing to pursue some or all of the claims by virtue of the assignments of its arbitration claims to the Assignee Banks; (iv) that Noga was not the real party in interest by virtue of the prior assignments; and (v) that Noga failed to join the Assignee Banks, which were necessary parties.

In August 2001, Noga moved to confirm and enforce the Phase I Award and to recognize and enforce the Swedish Court Judgments. The Russian Federation opposed the motion on the same grounds as those raised in the affirmative defenses contained in its Answer. In a twenty-seven-page, unpublished memorandum decision and order dated September 19, 2002, the District Court denied Noga's motion, finding that the Russian Federation was a separate entity from the Government and that the Russian Federation had not been a party to the arbitration "and did not intend to arbitrate the submitted dispute." The District Court further found that, because the Russian Federation had objected to being named in the arbitration, the tribunal's Phase I Award had been issued only against the Government. According to the District Court, "a non-party [could] not be bound by an arbitration award unless it clearly and unambiguously demonstrate[d] an intent to arbitrate the submitted dispute."

Although it did not need to reach the issue, the District Court also interpreted

---

**6.** It appears from this description that Mr. Rouch provided the equivalent of debtor-in-possession ("DIP") financing to Noga.

**7.** The action was filed in Kentucky because Noga sought to seize assets of the Russian Federation located there, including highly enriched uranium located at a United States Department of Energy uranium processing facility, to satisfy the Phase I Award. The

uranium was held pursuant to a 1993 agreement between the United States and the Government concerning the disposition of highly enriched uranium extracted from nuclear weapons. In June 2001, President Clinton issued an executive order blocking Noga's seizure of the uranium. *See* Exec. Order No. 13,159, 65 Fed.Reg. 39,279–80 (June 21, 2000).

the Concordat and the assignments as "suggest[ing] that the Assignee Banks [were] real parties in interest to this action and that the Russian Federation could be subject to multiple litigations and judgments," implying that these entities were "necessary" parties whose joinder was required by Fed.R.Civ.P. 19(a).[8] Final judgment was entered in the New York Action on September 25, 2002, and in the Kentucky Action on September 26, 2002. Noga timely appealed from both judgments, and we subsequently consolidated the appeals.

## DISCUSSION

I. *Can the Phase I Award Be Confirmed Against the Russian Federation?*

A. *Framework for Confirming International Arbitration Awards*

 Because Noga is seeking to enforce an arbitration award rendered in a foreign state, the confirmation of the Phase I Award is governed by the framework set forth in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 53 ("Convention"), as implemented by, and reprinted in, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201–08. "Under the Convention, [a] district court's role in reviewing a foreign arbitral award is strictly limited" and "the showing required to avoid summary confirmance is high." *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 19, 23 (2d Cir.1997) (internal quotation marks omitted). Specifically, the FAA provides that, upon the application of a party to an arbitration award made pursuant to the Convention, a district court shall enter "an order confirming the award as against any other party to the arbitration," unless the court "finds one of the grounds

for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." 9 U.S.C. § 207. As the party opposing confirmation, the Russian Federation bore the burden of establishing that the Phase I Award should not have been honored. *See Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.,* 969 F.2d 764, 770 (9th Cir.1992) (citing *La Societe Nationale Pour La Recherche v. Shaheen Natural Res. Co.,* 585 F.Supp. 57, 61 (S.D.N.Y.1983), *aff'd,* 733 F.2d 260 (2d Cir.1984) (per curiam)). This burden is imposed because "the public policy in favor of international arbitration is strong." *Fotochrome, Inc. v. Copal Co.,* 517 F.2d 512, 516 (2d Cir.1975).

The District Court declined to confirm the Phase I Award on the grounds that (i) the Russian Federation was not a party to the Swedish arbitration proceedings and (ii) this case did not fall under one of the limited exceptions in which we have held that an arbitration award can be enforced against a nonparty. *See Monegasque De Reassurances S.A.M (Monde Re) v. Nak Naftogaz of Ukr.,* 311 F.3d 488, 495 (2d Cir.2002) (listing five theories for binding nonsignatories to arbitration agreements: incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel); *see also Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 345 F.3d 347, 355–56 (5th Cir.2003). Consequently, the District Court concluded that it lacked jurisdiction to confirm the award against the Russian Federation. For the reasons that follow, we disagree with the District Court's conclusion that it lacked jurisdiction to confirm the Phase I Award against the Russian Federation.

---

8. The District Court also granted Noga's motion to domesticate the Swedish Court Judgments, but set off this amount against a much larger amount owed by Noga to the Government, which had taken an assignment from a Russian creditor of Noga in the Concordat. Noga has not appealed this portion of the District Court's judgment.

### B. *Choice of Law*

On appeal, Noga principally challenges the District Court's legal conclusion that the Russian Federation and the Government are not the same entities for the purpose of confirming the Phase I Award, and urges that we apply principles of federal common law or public international law to reach this conclusion. The Russian Federation counters that: (i) this case should be decided under principles of private international law, which dictate that Russian law be applied in determining whether the Russian Federation and the Government are the same entities; and (ii) under Russian law, the Russian Federation and the Government are separate entities.[9]

In making their respective choice-of-law arguments, both parties rely on the Supreme Court's decision in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*"Bancec"*). There, the Republic of Cuba established a state-owned trade bank "with full juridical capacity . . . of its own." *Id.* at 613, 103 S.Ct. 2591 (internal quotation marks omitted). This trade bank sued to collect on a letter of credit issued by an American bank. The American bank counterclaimed, asserting a right to set off the value of its assets in Cuba that had been nationalized by the Cuban government. *Id.* at 614–15, 103 S.Ct. 2591. The Cuban trade bank claimed immunity from this counterclaim under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq.

The Supreme Court concluded that the FSIA did not control the determination of whether the seized Cuban assets could be set off against the claim of the Cuban trade bank. Instead, the Court held that principles of public international law and federal common law—rather than Cuban domestic law—should be applied to determine the "effect to be given to [the Cuban trade bank's] separate juridical status." *Id.* at 621, 103 S.Ct. 2591. According to the Court, "[t]o give conclusive effect to the law of the chartering state in determining whether the separate juridical status of its instrumentality should be respected would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts." *Id.* at 621–22, 103 S.Ct. 2591. On the other hand, the Court cautioned that "[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee." *Id.* at 626, 103 S.Ct. 2591. Consequently, "the efforts of sovereign nations to structure their governmental activities in a manner deemed

---

**9.** The parties' use of the terms "public international law" and "private international law" appears to be taken from the *Restatement (Third) of the Foreign Relations Law of the United States* (1987), which defines "private international law" as "law directed to resolving controversies between private persons, natural as well as juridical, primarily in domestic litigation, arising out of situations having a significant relationship to more than one state," i.e., that which is referred to in American jurisprudence as "conflicts of laws." *See id.* § 101, cmt. c. The *Restatement (Third)* defines "public international law" as the "rules and principles of general application dealing with the conduct of states and of international organizations and with their relations *inter se*, as well as with some of their relations with persons, whether natural or juridical." *Id.* § 101. Our decisions have referred to this body of law as "customary international law" or the "law of nations." *See, e.g., Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 154–56 (2d Cir.2003).

necessary to promote economic development and efficient administration would surely be frustrated." *Id.* Thus, "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations" led the Court "to conclude ... that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626–27, 103 S.Ct. 2591.

As the principal issue in this appeal is *whether* the Government is an instrumentality established as a juridical entity distinct and independent from the Russian Federation, the *Bancec* decision is of little help to us here. In any event, because we conclude that the answer to this question is the same regardless which of the bodies of law advocated by the parties is applied here, we need not cut the Gordian choice-of-law knot presented to us by the parties. *Cf., e.g., Blake v. Comm'r*, 697 F.2d 473, 477 n. 4 (2d Cir.1982) (declining to decide whether to apply federal common law or state law where the result would be the same under either analysis).

### C. *Russian Law*

We turn first to the Constitution of the Russian Federation in determining whether the Government and the Russian Federation should be treated as separate parties for the purposes of this confirmation proceeding. That charter provides a detailed discussion of the relationship between these two entities. The Russian Constitution provides for a bicameral federal executive consisting of the President of the Russian Federation, who is described as being "the head of [S]tate," Konst. RF art. 80(1), and the Government, which shall exercise "[e]xecutive power in the Russian Federation," *id.* art. 110(1). The Government consists of the Chairman of the Government (who is appointed by the president, subject to consent of the State Duma, the federal legisla-

ture), and the Deputy Chairman of the Government and the federal ministers (who are appointed by the president in consultation with the Chairman of the Government). *Id.* arts. 83(a), (e), 110(2), 111(1).

The Russian Constitution also enumerates the responsibilities of the Government, which include, among other things: (i) submitting a federal budget to the State Duma; (ii) "ensur[ing] the implementation ... of a uniform financial, credit, and monetary policy"; and (iii) "exercis[ing] any other powers vested in [the Government] by the Constitution of the Russian Federation, [Russian] federal laws, and decrees of the President of the Russian Federation." *Id.* art. 114(a), (b), (g). To carry out these responsibilities, the Government is empowered to "issue decrees and orders," which "shall be binding throughout the Russian Federation." *Id.* art. 115(1), (2). Finally, the members of the Government serve at the pleasure of the President: they must resign upon the election of a new President, *id.* art. 116; they may resign only with the consent of the President, *id.* art 117(1); and the President also can require them to resign at any time, *id.* art. 117(2).

■ Plainly, in light of the description of the Government in the Russian charter, that entity is not a sovereign, corporation, or instrumentality separate from the Russian Federation. Rather, the Government is a political organ of the Russian Federation, analogous to the cabinet of the American president. Most significantly, in the words of one scholar, the Government "is not a juridical person and enjoys no autonomous legal capacity." William E. Butler, *Russian Law* 343 (2d ed.2003). Indeed, given the Supreme Court's *Bancec* decision, had either the Government or the Russian Federation wanted to shield the latter entity from being the subject of these confirmation proceedings, either could have designated a publicly-owned

state corporation or instrumentality as the entity to contract with Noga. At bottom, the Government was performing a quintessential "governmental" function: financing the purchase of massive quantities of basic necessities and infrastructure improvements to provide for the Russian people and paying for those necessities and improvements with the country's natural resources.

Finally, the Russian Federation has not satisfied its burden of proving that the Government is a separate juridical entity that can sue and be sued in Russian courts for obligations that are analogous to the ones set forth in the Loan Agreements or, indeed, for any legal obligations. For example, the Russian Federation could have presented docket entries or court filings from Russian courts indicating that the Government had sued or been sued in this capacity. No such evidence was presented to the District Court, however. Accordingly, we find that, under Russian law, the Government and the Russian Federation should be treated as the same party for the purpose of this confirmation proceeding.

D. *Federal Common Law*

The question of whether a federal court will confirm a foreign arbitration award against a sovereign nation, where one of the sovereign's political organs was a party to the arbitration, appears to be one of first impression. Federal courts have been asked to confirm such awards against a corporation owned or operated by a foreign sovereign under such theories as alter ego, piercing the corporate veil, or agency. *See, e.g., Monde Re*, 311 F.3d 488; *see generally* Carolyn B. Lamm & Jocelyn A. Aqua, *Defining the Party—Who Is a Proper Party in an International Arbitration Before the American Arbitration Association and Other International Institu-*

*tions,* 34 Geo. Wash. J. Int'l L. & Econ. 711 (2003) (discussing when U.S. courts will deem a foreign state to have consented to arbitration based on the acts of an instrumentality or state-owned entity). The Fifth Circuit's recent decision in *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, is illustrative.

There, an Argentinian corporation (Bridas) entered into a joint venture agreement with a production association formed and owned by the Government of Turkmenistan, which was not itself a party to the agreement. Bridas subsequently initiated an arbitration proceeding against both the production association and the Government of Turkmenistan, alleging breach of the agreement. *Id.* at 351–52. The arbitrators expressly rejected the argument of the Government of Turkmenistan that it was not a proper party to the arbitration because it had not signed the agreement. *Id.* at 352. The arbitrators subsequently issued an award in favor of Bridas, which successfully brought an action in the Southern District of Texas to confirm the award. On appeal, the Fifth Circuit declined to confirm the arbitration award against the Government of Turkmenistan under theories of agency, estoppel, and third party beneficiary. *Id.* at 356–58, 360–63. Nevertheless, the court remanded the case to the district court for further proceedings with respect to whether the production association was the alter ego of the Government of Turkmenistan, instructing the district court to consider, inter alia, the factors used by the Fifth Circuit in determining whether a state agency is the "alter ego" of a state for Eleventh Amendment sovereign immunity purposes. *Id.* at 358–60.

Likewise, this Court has been asked to confirm domestic arbitration awards under similar theories against nonparties to an arbitration proceeding or agreement.[10] It

10. *See, e.g., Gvozdenovic v. United Air Lines,*

*Inc.,* 933 F.2d 1100, 1105 (2d Cir.1991); *Or-*

is this latter line of cases that both the District Court and the Russian Federation cite in support of their conclusions that the Phase I Award should not be enforceable against the Russian Federation. But, as we noted above, analogizing the relationship between the Russian Federation and the Government to the relationship between a corporate parent and a subsidiary belies the reality of the political relationship between the Russian Federation and the Government and is thus inapposite. Analogies, as Cardozo warned of metaphors, "in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 94, 155 N.E. 58 (1926).

While the issue of the nature of the relationship between a foreign sovereign and one of its political organs has not been presented in the context of the enforcement and confirmation of an arbitration award, this issue has come up in other contexts, and in each of those contexts the fact of an internal separation of some sort between the sovereign and one or more of its organs has been found to be of no legal significance. The most developed area of federal common law concerning this issue relates to whether, in the context of the FSIA, a ministry or other political subdivision of a foreign sovereign should be treated either as the foreign state itself or a political subdivision of it (in which case it would be immune from suit), or as an "agency or instrumentality" of the foreign state (in which case it would be subject to suit under 28 U.S.C. § 1605(a)(3)). For example, in *O'Connell Machinery Co. v. M.V. "Americana"*, 734 F.2d 115, 116 (2d Cir.1984), we found that the Istituto per la Ricostruzione Industriale, "a public financial entity which coordinate[d] the management of the commercial enterprises of the Italian Government," was a political subdivision of Italy because it was a governmental unit beneath the central Italian government.

Ten years later, in *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C.Cir.1994), the District of Columbia Circuit held that the Bolivian Air Force was a foreign state rather than an agency or instrumentality of Bolivia because the air force's "core functions" were "predominantly governmental." According to the court, the "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." *Id.* at 153. Indeed, "[a]ny government of reasonable complexity must act through men organized into offices and departments." *Id.*[11] Consequently, "[n]umerous other courts have assumed without discussion that governmental departments or ministries [—including ministries of the Russian Federation and the former Soviet Union—] qualify as political subdivisions of a foreign state under the FSIA." *Garb v. Republic of Poland*, 207 F.Supp.2d 16, 37 (E.D.N.Y:2002), *vacated and remanded on other grounds*, 72 Fed. Appx. 850 (2d Cir. 2003).[12] Moreover, a similar conclusion was apparently reached by the Supreme

---

*ion Shipping & Trading Co. v. E. States Petroleum Corp. of Pan., S.A.*, 312 F.2d 299, 301 (2d Cir.1963).

**11.** *See also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234–35 (D.C.Cir.2003) (holding that the Iranian Ministry of Foreign Affairs was to be "treated as the state of Iran itself rather than as its agent" because "[t]he conduct of foreign affairs is an important and 'indispensable' governmental function"); *Garb v. Republic of Poland*, 207 F.Supp.2d 16,

38 (E.D.N.Y.2002) (concluding that Polish Ministry of Treasury was to be treated as a sovereign state), *vacated and remanded on other grounds*, 72 Fed.Appx. 850 (2d Cir.2003) (mem.).

**12.** *See, e.g., Magness v. Russian Fed'n*, 247 F.3d 609, 613 n. 7 (5th Cir.2001) (characterizing Russian Ministry of Culture as political subdivision of Russia for purposes of service of process); *S & Davis Int'l, Inc. v. Republic*

Court in *Bancec*, when in the course of reinstating the district court's opinion, the Court quoted that opinion's statement that "[t]he [Cuban] Ministry of Foreign Trade is no different than the Government [of Cuba] of which its minister is a member." 462 U.S. at 618 n. 5, 103 S.Ct. 2591 (quoting *Banco Nacional De Cuba v. Chase Manhattan Bank,* 505 F.Supp. 412, 425 (S.D.N.Y.1980)).

Notably, as the district court in *Garb* recognized, the United States adopted an analogous position in an amicus brief submitted in *Transaero.* There, the United States took the view that if a "judgment would essentially be one against the state and an entity's assets are not separate from those of the state, then the entity is not a legal person separate from the state even if, in a formalistic sense, that entity can enter into contracts in its own name, and sue or be sued in its own name." *See* Brief of Amicus Curiae United States at 17, *Transaero* (No. 92–7222), *quoted in Garb,* 207 F.Supp.2d at 37. The legal standard articulated in the *Transaero* amicus brief is the same standard that has been adopted by the Supreme Court in determining whether an agency or instrumentality of a state is entitled to Eleventh Amendment Immunity. *See Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 50–51, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). Indeed, it is black letter Eleventh Amendment law that the political agencies and departments of states are entitled to the same sovereign immunity as the state. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1998). Significant-

ly, in the case at bar, it is clear from both the record and statements made by counsel for the Russian Federation during oral argument before this Court that the Government owns no assets that could be attached to satisfy a judgment confirming the Phase I Award and, moreover, that all such assets are owned by the Russian Federation.

Finally, we note that an issue similar to the one before us has arisen in the federal common law of bankruptcy and set off. Specifically, when monies are owed to an individual by one federal agency and that individual owes a debt to another federal agency, the two federal agencies may set off the debts owned by one of them against the claims of the other. In other words, the agencies are treated as constituent parts of a unitary entity. *See, e.g.,* 31 U.S.C. § 3716(a); *Citizens Bank of Md. v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *Turner v. Small Bus. Admin. (In re Turner),* 84 F.3d 1294, 1296–97 (10th Cir.1996) (en banc).

■ In sum, under the federal common-law principles articulated above, no meaningful legal distinction can be drawn between a sovereign and one of its political organs. Accordingly, the Russian Federation has failed to overcome the presumption in favor of confirming the Phase I Award, and it has failed to demonstrate that the Government should be treated as a separate party from the Russian Federation in this context under federal common law.

### E. *International Law*

■ The distinction made by the District Court between the acts of a sovereign and the acts of one of its governmental

---

*of Yemen,* 218 F.3d 1292, 1298 (11th Cir. 2000) (characterizing Yemeni Ministry of Supply & Trade as political subdivision of Yemen for purposes of determining legal status of entity controlled by Ministry); *Filus v.*

*Lot Polish Airlines,* 819 F.Supp. 232, 236–37 (E.D.N.Y.1993) (characterizing Ministry of Civil Aviation of USSR alternately as foreign state itself and as political subdivision thereof for purposes of service of process).

organs also finds no basis in international law. An axiomatic principle of international law is that "[t]he conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State." Draft Articles on Responsibilities of States for Internationally Wrongful Acts ("Draft Articles"), art. 4(1), *reprinted in Report of the International Law Commission on the Work of Its Fifty–Third Session,* U.N. GAOR, 56th Sess., Supp. No. 10, at 84, U.N. Doc. A/56/10 (2001) ("ILC Report"), *available at* http://www.un.org/law/ilc/convents.htm.[13] As the commentary to this provision of the Draft Articles explains, "[t]he replies by Governments to the Preparatory Committee for the 1930 Conference for the Codification of International Law were unanimously of the view that the actions or omissions of organs of the State must be attributed to it." *Id.* art. 4(1) cmt. 4 (footnote omitted), *reprinted in* ILC Report at 85. "The Third Committee of the Conference adopted unanimously on first reading an article 1, which provided that international responsibility shall be incurred by a State as a consequence of any failure on the part of its organs to carry out the international obligations of the State." *Id.* (internal quotation marks omitted).

The maxim that the acts of an organ of a sovereign's government are attributable to the sovereign have also been regularly applied in international courts and arbitrations. *See* Lamm & Aqua, *supra,* at 730–34. For example, in *Texaco Overseas Petroleum Co. v. Government of the Libyan Arab Republic,* 53 I.L.R. 393 (1975), the arbitrator rejected the Libyan Government's objections to the tribunal's jurisdiction to arbitrate claims arising out of Libya's nationalization of its oil industry. One of those objections was that the contracts in question had been entered into by the Libyan Minister of Petroleum and thus Libya, "a sovereign State, was not a party to these contracts." *Id.* at 415. Citing to the 1970 draft of the (as yet unfinished) Draft Articles, the arbitrator overruled this objection, concluding that "it [was] incontestable and uncontested that, if the 'Ministry of Petroleum' or any other qualified organ of the Libyan Government ... ha[d] entered into Deeds of Concession, such organ acted as the organ duly qualified and authorized to do so by the Libyan Government." *Id.* at 416. Thus, it was "the Libyan Arab Republic ... and that State alone—which ha[d] become bound by the acts performed by its own organs." *Id.*[14]

---

**13.** The Draft Articles were adopted by the International Law Commission ("ILC") of the United Nations in August 2001 and are the product of nearly forty years of work by the ILC to codify the principles of international law stated therein. James Crawford, *The International Law Commission's Articles on State Responsibility* ix (2002). By resolution dated December 12, 2001, the United Nations General Assembly took note of the Draft Articles, annexed them to the resolution, and "commend[ed] them to the attention of [the member] Governments without prejudice to the question of their future adoption or other appropriate action." G.A. Res. 83, U.N. GAOR, 56th Sess., Supp. No. 49 (vol.I), at

499, 500, U.N. Doc. A/56/83 (2001). We note that the Draft Articles, as the work of scholars, are not a primary or constitutive source of authority on international law, but rather are relevant only inasmuch as they may provide accurate evidence of the practice of States. *See Flores,* 343 F.3d at 156; *United States v. Yousef,* 327 F.3d 56, 99–103 (2d Cir.), *cert. denied,* — U.S. —, 124 S.Ct. 353, 157 L.Ed.2d 241 (2003).

**14.** *See also Compania de Aguas de Aconquija, S.A. v. Argentine Republic,* ICSID Case No. ARB/97/3 at 17, ¶ 49 (2000) ("Under international law ... it is well established that actions of a political subdivision of [a] federal

In sum, we hold that regardless of whether principles of Russian law, federal common law, or international law are applied, the Russian Federation and the Government are not separate "parties" for the purposes of confirming and enforcing an arbitral award under the Convention. Accordingly, the judgment of the District Court denying Noga's motion to confirm is vacated.

II. *What Effect Does Noga's Assignments of Its Arbitration Claims to Its Creditors Have on These Proceedings?*

As noted above, the Russian Federation also sought dismissal of Noga's complaint on the grounds that Noga was not the real party in interest by virtue of Noga's prior assignments to the Assignee Banks and its subsequent failure to join them as parties in either the New York or Kentucky Actions. Because the District Court dismissed Noga's complaint on the ground that the Phase I Award could not be enforced against the Russian Federation, the court did not reach these alternative bases for dismissal. However, Judge Pauley opined in a footnote that "the Condordat, together with the claim assignments themselves[,] suggests that the Assignee Banks are real parties in interest to this action and that the Russian Federation could be subject to multiple litigations and judgments." Judge Pauley further opined in this same footnote that the Assignee Banks' "absence from this action [appeared to] compromise their ability to protect their interests in the Award."

On appeal, Noga invites us to exercise our power to consider these issues sua sponte to "preempt possible error on remand." Given the complexities of the legal issues presented and the lack of a sufficiently developed factual record to decide them, we decline to accept this invitation and remand the case to the able District Court for further development of the record and specific resolution of these remaining issues, as well as the other defenses raised by the Russian Federation in its Answer.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion.

JACOBS, Circuit Judge, concurring.

I concur in the result reached in the majority opinion and subscribe to the Discussion in Parts I.A, I.D, I.E, and Part II. I write separately on the choice of law issue and certain aspects of federal common law to explain by what route I arrive at the same place as the majority.

### I

Compagnie Noga D'Importation et D'Exportation S.A. ("Noga") appeals from the district court's refusal to confirm a Swedish arbitration award against the

---

state ... are attributable to the central government."), *available at* http://www.worldbank.org/icsid/cases/ada_AwardoftheTribunal .pdf; 1 Sir Robert Jennings & Sir Arthur Watts, *Oppenheim's International Law* 540 (9th ed. 1996) ("States, being juristic persons, can only act through the institutions and agencies of the state, its officials and employees—commonly referred to collectively as organs of the state. Their acts or omissions when acting officially in their capacit[ies] as state organs are acts of the state, and the state bears responsibility for all such acts as involve a breach of the state's international obligations, even though in the consideration of the state the organ is independent, and irrespective of whether it is a superior or subordinate organ."); 2 D.P. O'Connell, *International Law* 1043 (1965) ("There is no difficulty in imputing the acts of public officials, performed within the limits of their competence, to the State.").

Russian Federation (the "Federation") pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 53 (the "Convention"). Congress adopted the Convention in 1970 and implemented it through amendment to the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. §§ 201–208 (1994). As the Supreme Court noted soon after implementation:

> The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.

*Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). Section 207 of the FAA says who may confirm against whom:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for *an order confirming the award as against any other party to the arbitration.* The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207 ("§ 207") (emphasis added). The dispositive question on this appeal is thus whether the Federation was a "party" to the arbitration proceedings that resulted in the award Noga seeks to confirm. The Federation says that it was the Government of the Russian Federation (the "Government"), and not the Federation itself, that participated in the Swedish arbitration proceedings. Noga counters that there is no legal or factual difference be-

tween the Federation and the Government, and that both entities are fully liable on Noga's arbitration award.

As the majority opinion explains, the first thing is to determine which body of substantive law should be applied to resolve the status of the Federation vis-à-vis the Government. *See* Maj. Op. at 684–85. The parties offer three sources of law: private international law (which the Federation maintains mandates application of Russian Law), federal common law, and public international law. The majority opinion deems it unnecessary to cut this "Gordian choice-of-law knot" because all three sources of law yield the same result. On that basis (*i.e.,* that the choices of law present a false conflict), the majority opinion decides that the Federation and the Government are not separate juridical entities for the purposes of a confirmation proceeding under § 207. *Id.* at 685.

I think that the law is sufficiently clear that there is no reason to sidestep the choice of law question disputed by the parties. The Supreme Court's interpretation of the FAA requires the application of federal common law to determine who is a proper "party" to a confirmation proceeding brought pursuant to § 207. This result is consistent with the precedent of this Court, *see Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 712–13 (2d Cir.1987), and the federal interests advanced by the FAA.

Section 2 of the FAA requires that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This "congressional declaration of a liberal federal policy favoring arbitration agreements ... create[s] a body of federal substantive law of arbitrability, applicable to *any* arbitration agreement within the coverage of the Act." *Moses H. Cone Mem.*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (emphasis added). "[A]t least since this Nation's accession in 1970 to the Convention, and the implementation of the Convention in the same year by amendment of the Federal Arbitration Act," the federal policy in favor of arbitration "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (citation omitted).

The loan agreements between Noga and the Federation—which contain the parties' agreement to arbitrate—are subject to the Convention, and thus come within the coverage of the FAA, as does Noga's claim to confirm the Swedish arbitration awards at issue here—a cause of action created by § 207. The question whether the Federation is a proper party to a § 207 action is thus properly decided under federal common law.

This result is consistent with the Supreme Court's interpretation of the FAA and serves the important federal policy favoring international arbitration agreements. Resort to federal common law is disfavored in most contexts, but it is favored where the application of foreign law (as the Federation advocates) conflicts with an important federal policy. *See Atherton v. FDIC*, 519 U.S. 213, 218, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997). When it comes to the enforcement of an arbitral award pursuant to § 207, "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes" come into play, *Mitsubishi Motors*, 473 U.S. at 629, 105 S.Ct. 3346, and militate in favor of using federal common law to ascertain whether the requirements of the statute have been met. The majority opinion commits no error, and I think that the choices of law advanced by the parties present a false conflict, but I think it is a more natural development of the analysis to identify the proper source of law and apply it. Doing so provides guidance to parties considering where they may seek to enforce an arbitration agreement or to confirm an award under the Convention. Many bodies of law are potentially implicated in complex, international commercial agreements; in this case, the candidates are Swiss law, Russian law, the federal law of the United States, and international law. Parties seeking to enforce a commitment to arbitrate or an arbitration award should know that if they choose the relief afforded by Congress under the FAA, the viability of their cause of action will be adjudicated under federal law.

## II

The majority opinion considers several bodies of federal common law—including the Foreign Sovereign Immunities Act, the Eleventh Amendment, and the Bankruptcy Act—to conclude that the Russian Government is not a juridical entity separate from the Russian Federation in the context of a § 207 confirmation proceeding. Maj. Op. at 686–87. Among other things, the majority observes that "it is black letter Eleventh Amendment law that the political agencies and departments of states are entitled to the same sovereign immunity as the state." *Id.* at 688. I respectfully submit that this characterization overstates the reach of the Eleventh Amendment and allocates insufficient weight to the presumption "that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626–27, 103 S.Ct. 2591, 77 L.Ed.2d 46

(1983) ("*Bancec*"); *see generally, id.* at 623–33, 103 S.Ct. 2591.

The Court in *Bancec* recognized that separate juridical status ought to be respected in most cases, but nonetheless allowed Citibank to take an offset for assets expropriated by Cuba against the proceeds of a letter of credit presented to Citibank by a bank created and operated by the Cuban government. *Id.* at 633, 103 S.Ct. 2591. The Court applied principles of federal common law and international law—rather than Cuban law—to resolve the issue of the bank's status vis-à-vis the Cuban government, because "to give conclusive effect to [Cuban] law . . . in determining whether the separate juridical status of its [bank] should be respected would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts." *Id.* at 621–22, 103 S.Ct. 2591. In this case, therefore, even though the Federation may be "interpos[ing] its separate juridical status" (*id.* at 623, 103 S.Ct. 2591) to defeat a legitimate claim for arbitral confirmation, *Bancec* requires that we start with a robust presumption that the Government and the Federation are separate juridical entities.

I agree with the majority opinion that the Russian Government would share in any (hypothetical) Eleventh Amendment immunity the Russian Federation would enjoy under federal law, but I do not think the Government's immunity is a forgone conclusion. "[T]he [Supreme] Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions . . . even though such entities exercise a 'slice of state power.' " *Lake Tahoe Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). It is only when a state-created entity functions as a "arm of the state" that it takes on the state's Eleventh Amendment immunity. Thus, if the Russian Government would share in the Federation's (hypothetical) immunity under the Eleventh Amendment, the Federation is a proper party to Noga's § 207 confirmation proceeding.

This Court revamped its application of the arm-of-the-state doctrine in *Mancuso v. New York State Thruway Authority*, 86 F.3d 289 (2d Cir.1996). In the first of two steps, we examine the six factors derived from *Lake Tahoe*:

(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.

*Mancuso*, 86 F.3d at 293. If these factors point in different directions, we ask: "(a) will allowing the entity to be sued in federal court threaten the integrity of the state? and (b) does it expose the state treasury to risk?" *Id.; accord Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 47–52, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

Applying the *Lake Tahoe* factors to this case, it is clear enough that the Russian Government is an arm of the Russian Federation.

*Creating Documents.* The Government is given life through the Constitution of the Russian Federation. Under Article 10, "State power in the Russian Federation [is] exercised on the basis of the separation of the legislative, executive and judiciary branches," Konst. RF art. 10; it is exercised "*by* the President of the Russian Federation, the Federal Assembly (Council of the Federation and State Duma), the *government* of the Russian Federation and courts of the Russian Federation." *Id.*

art. 11(1) (emphasis added). The Government's role as an executor of state power is reiterated in Article 78: "[t]he President of the Russian Federation and the government of the Russian Federation *shall*, under the Constitution [of the Russian Federation], exercise the authority of federal state power throughout the territory of the Russian Federation. *Id.* art. 78(4) (emphasis added)."

Chapter 6 of the Russian Constitution deals specifically with the Government and its objects. Under Article 110:

> (1) Executive power in the Russian Federation shall be exercised by the Government of the Russian Federation.
>
> (2) The Government of the Russian Federation shall consist of the Chairman of the Government of the Russian Federation, Deputy Chairmen of the Government and federal ministers.

*Id.* at art. 110. Taken together, the Constitutional description of the Government as a repository and designated executor of "state" power weighs in favor of immunity.

*Appointment of governing members.* The President of the Federation (himself an executor of state power) appoints the Chairman of the Government with the consent of the State Duma. *Id.* art. 83(a). The President also has the right to "preside" over meetings of the Government and can "decide on resignation of the Government." *Id.* arts. 83(b), (c). Moreover, the President has plenary power to "appoint and dismiss deputy chairmen of the Government ... and federal ministers as proposed by the Chairman of the Government ..." *Id.* art. 83(e). These provisions suggest that the members of the Government serve entirely at the pleasure of the president, who is a separate (and by implication, hierarchically superior) executor of state power. These circumstances militate in favor of immunity. *Compare Lake Tahoe*, 440 U.S. at 401–02, 99 S.Ct. 1171 (finding no immunity and noting that six of ten governing members of the Tahoe Regional Planning Agency ("TRPA") are appointed by counties and cities; only four are appointed by Nevada and California); *Mancuso*, 86 F.3d at 295 ("This factor ... favors a finding of immunity: all three board members are appointed by the Governor of New York with the advice and consent of the state Senate.")

*Funding:* The record on this factor is not voluminous. Still, the Federation's own expert adduces facts that would favor immunity:

> According to the 1964 Civil Code (article 24), which was still in force in 1991–92 when the Loan agreements were signed, there were State institutions, which generally could freely dispose of money received from the state budget within their estimates. The Government is such an institution. Similarly, certain assets are conceded to the Government's management for the Government's need. The Government receives funding from the State in accordance with its budget. And it can use that funding, among other things, to pay salaries to personnel, to pay for electricity, water supply and waste removal, and to enter into certain civil contracts.

(Opinion of Alexei Avtonomov at ¶ 9.) The Government's financial dependency on the Federation favors immunity. *Compare Lake Tahoe*, 440 U.S. at 402, 99 S.Ct. 1171 (funding provided by counties [*i.e.*, nonimmune political subdivisions], not the States of California and Nevada); *Mancuso*, 86 F.3d at 295 (noting that New York state was not required to fund the New York State Thruway Authority; finding no immunity and observing that "the limited nature of [any] instances of state funding establish that in general the Thruway Authority is self-funded").

*The entity's functions.* This factor weighs heavily in favor of immunity. The

duties of the Russian Government, set forth below *in extenso*, are enumerated in the Russian Constitution:

(1) The Government of the Russian Federation *shall:*

(a) develop and submit the federal budget to the State Duma and ensure compliance therewith; submit a report on the execution of the federal budget to the State Duma;

(b) ensure the implementation in the Russian Federation of a uniform financial, credit and monetary policy;

(c) ensure the implementation in the Russian Federation of a uniform state policy in the field of culture, science, education, health, social security and ecology;

(d) manage federal property;

(e) adopt measures to ensure the country's defense, state security and the implementation of the foreign policy of the Russian Federation;

(f) implement measures to ensure legality, the rights and freedoms of citizens, protect property and public law and order and control crime;

(g) exercise any other powers vested in it by the Constitution of the Russian Federation, federal laws and the decrees of the President of the Russian Federation.

(2) The work of the Government of the Russian Federation shall be regulated by federal constitutional law.

RF Konst. art. 114 (emphasis added). These mandates are obligations of a state. Local governments do not make monetary policy, implement foreign policy, or provide for national defense. *Compare Lake Tahoe*, 440 U.S. at 402, 99 S.Ct. 1171 ("The regulation of land use is traditionally a function performed by local governments."); *Mancuso*, 86 F.3d at 295 (noting that the New York State Thruway operates and constructs roads and bridges throughout the entire state, "a function the state would normally provide"). Broad objects of state government in the Federation are set forth in Article 7:

The Russian Federation shall protect the work and health of its people, establish a guaranteed minimum wage, provide state support for family, motherhood, fatherhood and childhood, and also for the disabled and for elderly citizens, develop a system of social services and establish government pensions, benefits and other social security guarantees.

Konst. RF art. 7(2). As the district court noted, the loan agreements underlying this arbitration dispute

extended credits and loans totaling $550,000,000 to the [Government] for the purchase of durable goods, consumer goods, agro-industrial products, and foodstuffs .... On January 29, 1992, Noga and the Government ... entered into a loan agreement in which Noga extended $400,000,000 of credit for the purchase of pesticides and other agrochemical products.

*Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Federation*, No. 00 Civ. 0632, 2002 WL 31106345 at *2 (S.D.N.Y. Sept. 19, 2002). The products purchased (and the magnitude of the loans) suggest that the Government entered into these agreements for the benefit of the Russian people and economy.

*Veto power.* Article 115 of the Russian Constitution provides that:

The decrees and executive orders of the Government of the Russian Federation may be repealed by the President of the Russian Federation if they contravene the Constitution of the Russian Federation, federal laws and the decrees of the President of the Russian Federation.

Konst. RF art. 115(3). This language suggests that the Government can enact decrees and orders, independent of the President, that are not subject to presidential

veto. But the President's power to fire Government ministers at will and call for the Government's resignation is a veto *de facto, i.e.,* the Government is not going to do anything the President opposes. *Compare Lake Tahoe,* 440 U.S. at 402, 99 S.Ct. 1171 (noting that the TRPA's authority "within its jurisdiction is not subject to veto at the state level"); *Mancuso,* 86 F.3d at 295 (noting that once appointed, the actions of Thruway officials are "essentially unreviewable either by other state officers, or by the Legislature"). The Federation's expert agrees with this view: "[t]he President may also dismiss in any moment the Government. The Government is politically dependent upon the President and the Parliament and the Government's authority is limited." (Opinion of Alexei Avtonomov at ¶ 12.)

*Whether the Entities Obligations are binding on the State.* This inquiry is somewhat circular here; nonetheless: (i) the Government appears to be entirely dependent on the State for funding (see discussion of the funding factor, *supra* ); and (ii) according to Noga's expert, " 'the national internal debt of the Russian Federation [was] defined as the liabilities of the Russian Federation Government in the currency of the Russian Federation (hereinafter 'the liabilities of the Russian Federation') to legal entities and individuals' " through at least the year 2000. (Opinion of Mikhail Issakovich Braginsky (quoting Art. 1 Russian Federation Law No. 3877–1 of the 13th of November 1992).) The Federation's expert counters that the Government's loan agreement with Noga was denominated in U.S. dollars and notes that the law has been repealed, but offers no evidence that the Government's debts are its own, independent of the Federation.

Taken together, all of the *Lake Tahoe* factors as applied to the Russian Government militate in favor of hypothetical Eleventh Amendment immunity; that analysis indicates that the Federation is properly liable as a "party" against whom Noga's arbitration award can be enforced. The majority opinion reaches essentially the same conclusion in its analysis of Russian law. *See* Maj. Op. at 685–86. But in the context of a confirmation action under the FAA, the status of the Government under its creating documents and the other "arm of the state" criteria is properly examined under federal common law.

\* \* \* \* \* \*

I subscribe to the majority opinion's discussion of federal common law in all other respects, and concur in the result that the Russian Federation is a proper party to the underlying § 207 confirmation proceeding and should be liable for any recovery to which Noga may be entitled pending resolution of the issues remanded for further consideration.